832 F.2d 513
 56 USLW 2264, 4 U.S.P.Q.2d 1497, 23
Fed. R. Evid. Serv. 1272
 BRUNSWICK CORPORATION, a Delaware Corporation,
Plaintiff-Appellant/Cross- Appellee,
v.
SPINIT REEL COMPANY, an Oklahoma Corporation, and Don
McIntire, Defendants- Appellees/Cross-Appellants.
 Nos. 84-2581, 84-2624.
 United States Court of Appeals,
Tenth Circuit.
 Oct. 15, 1987.
 
 Thomas P. Johnson of Mayer, Brown & Platt, Denver, Colo. (Donald C. McKinlay of Mayer, Brown & Platt, Denver, Colo., and E.C. Heininger, Robert J. Kriss and Barbara Bertok of Mayer, Brown & Platt, Chicago, Ill., with him on the briefs), for plaintiff-appellant/cross-appellee.
 Gary W. Boyle (Lance Stockwell with him on the briefs) of Boesche, McDermott & Eskridge, Tulsa, Okla., for defendants-appellees/cross-appellants.
 Before McKAY and MOORE, Circuit Judges, and BROWN, District Judge*.
 McKAY, Circuit Judge.
 
 
 1
 Appellant Brunswick Corporation is a Delaware corporation with its principal place of business in Skokie, Illinois. Zebco is a division of Brunswick which manufactures and sells fishing equipment, including spin-cast reels and tackle combinations. Zebco's most popular reel is the Zebco Model 33.
 
 
 2
 Don McIntire, a longtime employee of Zebco, left the division on January 1, 1982. Some months later Mr. McIntire, with a few friends and associates, started a business to manufacture and market closed face spin-cast fishing reels. Spinit Reel, the resulting company, began manufacture and sales of the SR 210 reel by February 1983.
 
 
 3
 Zebco developed the concept of the closed face spin-cast reel, and the Zebco Model 33, introduced in 1954, differs in appearance from any spin-cast reel in the market except the SR 210. The Zebco has a distinctive profile with a chrome, cone-shaped front cover, a "stubby" back cover and a black and chrome finish. See Appendices 1 & 2.
 
 
 4
 In mid-February 1983, Spinit was notified of Zebco's concern that the SR 210 violated Zebco's rights under the Lanham Act and other laws. Zebco requested that Spinit stop producing the SR 210 in its present form and change the front and back covers to avoid confusion. The parties attempted to negotiate changes in the design, and Zebco proposed seven different front covers for Spinit to use, but the parties failed to reach any agreement. Spinit did, however, subsequently make some changes to the shape of the SR 210.
 
 
 5
 Brunswick filed a complaint against Spinit and Mr. McIntire on March 17, 1983, charging that Spinit had engaged in unfair competition by manufacturing the SR 210 which had been deliberately copied from the Zebco Model 33 reel. In June, Brunswick applied for a preliminary injunction which the trial court denied, and set trial for the following September. On October 18, 1984, more than a year after trial, the district court ruled that sales of both versions of the SR 210 violated the Lanham Act and enjoined Spinit from further manufacture of either version of the SR 210 or anything identical or confusingly similar to the Zebco Model 33. The court also ordered Spinit to recall all models of the SR 210. The court declined to award Brunswick damages or attorney's fees.
 
 
 6
 Brunswick appeals from the trial court's ruling that Spinit did not violate the Oklahoma Deceptive Trade Practices Act, that the court denied Brunswick damages and attorney's fees under the Lanham Act and the Oklahoma Act as well as the court's denial of Brunswick's motion for discovery of post-trial damages for the year after the trial but before the court's decision was issued. Brunswick also appeals the court's failure to award damages to Brunswick for Spinit's failure to pay royalties under a licensing agreement.
 
 
 7
 Spinit cross-appeals, seeking reversal of the court's ruling that Spinit violated the Lanham Act, the imposition of the injunction and the refusal to bar Brunswick's action under a theory of laches.
 
 I. Lanham Act
 
 8
 Section 43(a) of the Lanham Act, 15 U.S.C. Sec. 1125(a) (1982), affords a civil action for a party injured by a competitor's "false designation of origin" on its product.[1] The injured party may sue if it believes it has or will suffer damages because the competitor's product or packaging is so similar as to confuse purchasers of the product's source. See LeSportsac, Inc. v. K Mart Corp., 754 F.2d 71, 75 (2d Cir.1985). Although the party may not have a federally registered trademark, the product may have an image or look, referred to as "trade dress," that is so distinctive as to become an unregistered trademark eligible for protection under the Lanham Act. Id. "Although historically trade dress infringement consisted of copying a product's packaging, ... 'trade dress' in its more modern sense [may] refer to the appearance of the [product] itself...." American Greetings Corp. v. Dan-Dee Imports, Inc., 807 F.2d 1136, 1140 (3d Cir.1986) (quoting Ideal Toy Corp. v. Plawner Toy Mfg. Corp., 685 F.2d 78, 80 n. 2 (3d Cir.1982)). Generally, to be eligible for protection, the product's "trade dress" must be nonfunctional and have acquired a secondary meaning.[2] If the trade dress is eligible for protection, to recover under the Lanham Act the plaintiff must further establish that there is a likelihood of confusion between the products. J.M. Huber Corp. v. Lowery Wellheads, Inc., 778 F.2d 1467, 1470 (10th Cir.1985).
 
 
 9
 In its appeal, Spinit challenges the trial court's conclusion that Spinit's production and sale of the SR 210 violated the Lanham Act on two grounds: (1) Brunswick did not demonstrate that the front cover design of the Zebco Model 33 was nonfunctional; and (2) Brunswick failed to show a likelihood of confusion between the products.
 
 A. Functionality
 
 10
 Spinit first charges that, in its determination of whether the Zebco Model 33 was protected, the trial court applied the wrong test to determine functionality. The trial court used the following standard: "The configuration of a product is functional and copying is allowed only if that particular configuration is essential to the use or purpose of the product or if an adverse effect on cost or quality would result if that configuration were not used." Amended Findings of Fact and Conclusions of Law, record, vol. 1, at 493-94 (citing Inwood Laboratories, Inc. v. Ives Laboratories, Inc., 456 U.S. 844, 850 n. 10, 102 S.Ct. 2182, 2187 n. 10, 72 L.Ed.2d 606 (1982)). In the Inwood Laboratories case, the Supreme Court stated the standard for determining functionality only "in general terms," and that in dictum. Nor has this court defined the standard for determining functionality. Thus, we are faced with an issue of first impression.
 
 
 11
 Spinit urges that the district court should have applied an expansive definition of functionality as first articulated in Pagliero v. Wallace China Co., 198 F.2d 339 (9th Cir.1952):
 
 
 12
 If the particular feature is an important ingredient in the commercial success of the product, the interest in free competition permits its imitation in the absence of a patent or copyright. On the other hand, where the feature or, more aptly, design, is a mere arbitrary embellishment, a form of dress for the goods primarily adopted for purposes of identification and individuality and, hence, unrelated to basic consumer demands in connection with the product, imitation may be forbidden where the requisite showing of secondary meaning is made. Under such circumstances, since effective competition may be undertaken without imitation, the law grants protection.
 
 
 13
 Id. at 343 (citations omitted). To support its argument, Spinit cites several cases in the Second and Ninth Circuits which examine whether a product feature is an important ingredient in the product's commercial success to determine functionality. See, e.g., Industria Arredamenti Fratelli Saporiti v. Charles Craig, Ltd., 725 F.2d 18, 19 (2d Cir.1984); International Order of Job's Daughters v. Lindeburg & Co., 633 F.2d 912, 917 (9th Cir.1980), cert. denied, 452 U.S. 941, 101 S.Ct. 3086, 69 L.Ed.2d 956 (1981).
 
 
 14
 Both circuits, however, have since refined their interpretations of functionality. In Vuitton et Fils S.A. v. J. Young Enterprises, Inc., 644 F.2d 769, 773 (9th Cir.1981), the Ninth Circuit explicitly rejected an interpretation that would define, as a matter of law, any feature of a product that contributes to its consumer appeal and marketability, as a functional element of the product while the Second Circuit has implicitly done the same. LeSportsac, Inc., 754 F.2d at 77. Both courts instead describe a feature that may be protected as one whose principal purpose is to identify the producer. Id. at 78; Vuitton et Fils S.A., 644 F.2d at 774-75. Although the protected feature may also serve a useful role, it can be distinguished from a feature that is "functional" and thereby not entitled to protection because the "functional" feature's principal purpose is an essential benefit of the product's cost or purpose. LeSportsac, Inc., 754 F.2d at 76; Vuitton et Fils S.A., 644 F.2d at 774-75. This distinction is not drawn between features that are aesthetic and those that are operational; both courts recognize that aesthetics may play a major role in the consumer appeal of a product. LeSportsac Inc., 754 F.2d at 78; Vuitton et Fils S.A., 644 F.2d at 774. Instead, each court attempted to shape a rule that would prevent a producer from monopolizing a design feature that benefits a product's use (whether operational or aesthetic) while at the same time protecting a producer who takes the initiative to develop innovative or imaginative designs to identify his product. Both courts, therefore, rejected the "important ingredient" test because it would be a disincentive to creative design; "Trade dress associated with a product that has accumulated goodwill ... will almost always be 'an important ingredient' in the 'saleability' of the product." LeSportsac, Inc., 754 F.2d at 77. Despite their criticism of the "important ingredient" formulation, neither court clearly stated a test to be used for functionality.[3]
 
 
 15
 Other circuits have also rejected the "important ingredient" test. See, e.g., Sno-Wizard Mfg., Inc. v. Eisemann Prods. Co., 791 F.2d 423, 426 n. 3 (5th Cir.1986). Although courts have begun to examine the feature in light of its utility, the basis of their determinations rests on the feature's effect on competition. Thus, "[i]n trademark law, 'functional' means not that a feature serves a function; it means that the feature is one that competitors would find necessary to incorporate into their product in order to compete effectively." Vaughan Mfg. Co. v. Brikam Int'l, Inc., 814 F.2d 346, 349 (7th Cir.1987). See also Sno-Wizard Mfg., 791 F.2d at 426 n. 3; Vuitton et Fils S.A., 644 F.2d at 774; Prufrock Ltd. v. Lasater, 781 F.2d 129, 133 (8th Cir.1986). Thus, a tear-shaped plastic citrus juice container was protected, although the plastic bottle was obviously functional, because the requisite functions of the bottle (efficient shape for stacking, squeeze dispenser and light weight) did not dictate the distinctive tear-shape identifying the product. Sicilia Di R. Biebow & Co. v. Cox, 732 F.2d 417, 429 (5th Cir.1984). On the other hand, the most distinctive feature on a producer's woodburning stove, its two-level top, was held to be functional because, in addition to identifying the producer, its superior design improved the performance of three essential functions of the stove. Fisher Stoves, Inc. v. All Nighter Stove Works, Inc., 626 F.2d 193, 195 (1st Cir.1980).
 
 
 16
 The Third Circuit does not use competition as its determinant but instead focuses on a more utilitarian view, drawing a distinction between a feature whose value is in the product or service itself and a feature whose value is in identifying the producer. American Greetings Corp., 807 F.2d at 1142. Nevertheless, the Circuit still permits a court to consider whether the feature should not be protected " 'because [its] usefulness in identifying the source of the product or service is outweighed by the social interest in competition and improvements, which are advanced by giving competitors free access to' that feature." Id. (quoting United States Golf Ass'n v. St. Andrews Systems, 749 F.2d 1028, 1033 (3d Cir.1984)).
 
 
 17
 Similarly, we adopt a test whose focus is the effect on competition. That approach will better balance the dichotomy inherent in how best to promote competition. A recurring concern in many cases, one that encourages a broad definition of "functional," is that granting protection to a feature will create a monopoly which would prevent others from successfully competing with the individual who developed the feature. See, e.g., American Greetings Corp., 807 F.2d at 1142; Fisher Stoves, Inc., 626 F.2d at 195. At the same time the purpose of trademark protection is to allow manufacturers to place an identifying symbol or design on their brand to enable consumers to easily distinguish between competing products. W.T. Rogers Co. v. Keene, 778 F.2d 334, 338-39 (7th Cir.1985); Note, The Problem of Functional Features: Trade Dress Infringement Under Section 43(a) of the Lanham Act, 82 Col.L.Rev. 77, 91 (1982) [Columbia Note]. Thus, the question of whether the feature is functional should turn on whether "the protection of the configuration would 'hinder competition or impinge upon the rights of others to compete effectively in the sale of goods,' " Sno-Wizard Mfg., 791 F.2d at 426 n. 3 (quoting Sicilia Di R. Biebow & Co., 732 F.2d at 429).
 
 
 18
 Although this distinction may be subject to the same criticism as is the "important ingredient" test, that it is overbroad, we think it affords better protection to ensure that we do not discourage the "use of a spark of originality which could transform an ordinary product into one of grace." Keene Corp. v. Paraflex Indus., 653 F.2d 822, 825 (3d Cir.1981). Under our test, the claim may still be made that without a particular identifying design or feature a second-comer may be less effectively able to compete. If that feature must be slavishly copied in order to have an equally functional product, then the feature is not entitled to protection. Petersen Mfg. Co. v. Central Purchasing, Inc., 740 F.2d 1541, 1550 (Fed.Cir.1984). But if the feature enables the second-comer simply to market his product more effectively, it is entitled to protection. Sicilia Di R. Biebow & Co., 732 F.2d at 428.
 
 
 19
 This interpretation does not limit functional features to those essential to a product's operation. Because a function of certain products is aesthetic appeal, a feature intrinsic to the aesthetic appeal of those products may not be entitled to trademark protection. See Pagliero, 198 F.2d at 343-44 (producer's pattern on hotel china was an essential selling feature and therefore functional). Although the determination of functional in this setting may be difficult, the decision should nevertheless rest on whether alternative appealing designs or presentations of the product can be developed. See Vuitton et Fils S.A., 644 F.2d at 777 (protection of design on luggage did not hinder competition, although a feature of luggage is to be aesthetically pleasing, because competitor could manufacture own attractive design).
 
 
 20
 While the trial court did not articulate precisely the same test we have discussed here, its approach in determining whether the Zebco reel cover was functional incorporates our concerns. The court found that the reel cover's only functions are to hold the fishing line guide out in the front and provide a thumbstop in the back. Moreover, the particular configuration of the Zebco Model 33 was not the only design that could accommodate these functions; in fact, many spin-cast reels are made that perform the same functions, all of which have profiles different from the Zebco Model 33. Amended Findings of Fact and Conclusions of Law, record, vol. 1, at 488-89. Thus, the court implicitly considered whether the distinctive cone-shaped profile was indispensible to manufacturing a competitive spin-cast reel and determined it was not.
 
 
 21
 Spinit next argues that the trial court erred in imposing the burden of proof of functionality on Spinit. We agree with the Second Circuit that the question of functionality should be characterized as a defense. LeSportsac, 754 F.2d at 76.
 
 
 22
 Requiring the plaintiff to prove nonfunctionality in order to prevail might "defeat[ ] the Lanham Act's purpose of enabling a purchaser to distinguish one product from another because a plaintiff unable to prove that the features copied are nonfunctional will not prevail, no matter how compelling the evidence that purchasers are confused as to product source."
 
 
 23
 Id. (quoting Columbia Note at 87 n. 78) (citation omitted). The trial court correctly imposed the burden of proof of functionality on defendant. See also Inwood Laboratories, Inc., 456 U.S. at 863, 102 S.Ct. at 2193 (White, J., concurring); Vaughan Mfg. Co., 814 F.2d at 349. But see Litton Systems, Inc. v. Whirlpool Corp., 728 F.2d 1423, 1444-45 (Fed.Cir.1984); Fisher Stoves, Inc., 626 F.2d at 195 (although the appellate court did not have to address the issue, it commented that the trial court did not clearly err by placing the burden of proof on plaintiff).
 
 
 24
 Whether a product feature is functional is a factual finding and is therefore reviewed under the clearly erroneous standard. Inwood Laboratories, 456 U.S. at 857-58 n. 20, 102 S.Ct. at 2190 n. 20; LeSportsac, Inc., 754 F.2d at 76; Vuitton et Fils S.A., 644 F.2d at 775-76. Because of the trial court's ability to evaluate witness credibility and weigh evidence, we must affirm its finding unless we are "left with the 'definite and firm conviction that a mistake has been committed.' " Inwood Laboratories, 456 U.S. at 855, 102 S.Ct. at 2189 (quoting United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948)).
 
 
 25
 A review of the record convinces us that the trial court was justified in its finding. This case is not concerned with whether the front cover itself is functional, but whether the shape or configuration of the front cover is functional. Witnesses from both sides readily admit that the cover has a specific use. See, e.g., record, vol. 3, at 40; id., vol. 12, at 431. It is a means for picking up the fishing line, letting the line flow off the spool, id. vol. 12, at 431-32, and containing the internal mechanism, id., vol. 12, at 453. Nevertheless, the evidence indicates that such operations do not dictate the precise shape of the cover, rather a variety of shapes could accommodate those functions. Id., vol. 4, at 163, 175; vol. 6, at 407; vol. 12, at 445, vol. 13, at 552. Similarly, although the cover must fit comfortably in a fisherman's hand and be easy to use, the record does not show that the Zebco 33 cone shape is the only comfortable shape for a reel. See id., vol. 10, at 88. Thus, while the cover itself may be functional, the shape of the cover is not. See Sicilia Di R. Biebow & Co., 732 F.2d at 429; Truck Equip. Serv. Co. v. Fruehauf Corp., 536 F.2d 1210, 1218 (8th Cir.), cert. denied, 429 U.S. 861, 97 S.Ct. 164, 50 L.Ed.2d 139 (1976); Application of Mogen David Wine Corp., 328 F.2d 925, 933 (C.C.P.A.1964) (Rich, J., concurring).
 
 
 26
 Spinit's other contentions supporting its claim that the shape of the front cone is functional are also misplaced.[4] Regardless of which party bore the burden of proof, the evidence is ample to support the court's finding of nonfunctionality.
 
 B. Likelihood of Confusion
 
 27
 This court discussed the elements to be considered in determining the likelihood of confusion as to a product's source due to a similar trademark or trade dress in Beer Nuts, Inc. v. Clover Club Foods Co., 805 F.2d 920, 927 (10th Cir.1986). Those elements are not, however, the only factors a court may consider and, indeed, were not the only factors the district court considered. The district court relied heavily on evidence of actual confusion which, although not necessary for a finding of likelihood of confusion, id. at 928, may be the strongest evidence to support such a determination. See Oreck Corp. v. U.S. Floor Systems, 803 F.2d 166, 173 (5th Cir.1986), cert. denied, --- U.S. ----, 107 S.Ct. 2462, 95 L.Ed.2d 871 (1987); Frisch's Restaurant, Inc. v. Shoney's Inc., 759 F.2d 1261, 1267 (6th Cir.1985); Amstar Corp. v. Domino's Pizza, Inc., 615 F.2d 252, 263 (5th Cir.), cert. denied, 449 U.S. 899, 101 S.Ct. 268, 66 L.Ed.2d 129 (1980).
 
 
 28
 Spinit claims that the trial court's finding of likelihood of confusion is clearly erroneous because Brunswick did not offer evidence of actual confusion as a result of the shape of the reel. Instead Brunswick's examples were merely expressions of differentiation unrelated to the feature at issue. Brief of Appellee's and Cross-Appellants at 4, 6. Spinit cites a number of cases for the proposition that actual confusion does not occur when the second trademark or trade dress calls to mind the original. Rather, actual confusion occurs when the source of the copy is mistaken for the source of the original. While we agree with that distinction, it does not apply here. The cases Spinit cites are ones in which the consumer was more likely to recall the original source than to mistake the copy for the original because the products involved were quite different. E.g., Carson v. Here's Johnny Portable Toilets, 698 F.2d 831 (6th Cir.1983) (men's clothing and toiletries as opposed to portable toilets). In the present case, however, testimony indicated that both customers and retailers thought that Zebco was the source of the Spinit SR 210 because of the shape of the reel. Record, vol. 3, at 24 (on first seeing SR 210, writer for fishing magazine thought it was a Zebco 33); vol. 4, at 107-09 (salesman heard customer say he had bought a Zebco when he had bought an SR 210); vol. 12, at 312 (salesman reports customer's reaction on first seeing the SR 210 was that it was a Zebco 33). Contrary to defendant's contention, the evidence also showed that the confusion was due to the similarity in the shape of the SR 210 and the 33 reel. See, e.g., record, vol. 12, at 426 (J.C. Penney merchandise manager testified no other reel so closely resembles the 33); vol. 9, at 6 (the SR 210s sold well because of an "identifiable look," similar to the Zebco 33); vol. 13, at 484 (some distributors did not want to purchase the SR 210 because it looked so similar to the 33).
 
 
 29
 Spinit also objects to any reliance the trial court may have placed on a mistaken communication from a customer. As the cases that Spinit cites suggest, by itself, an instance of mistaken communication may not support a finding of confusion; but evidence of an actual buyer communicating with the wrong source of the product is worthy of consideration. Safeway Stores, Inc. v. Safeway Discount Drugs, Inc., 675 F.2d 1160, 1167 (11th Cir.1982). Brunswick introduced evidence of an SR 210 owner who had sent the reel to Zebco for repair. Record, vol. 3, at 99-102. Although this is evidence of a single instance, the confused owner is precisely the one whose "confusion is most significant." Safeway Stores, Inc., 675 F.2d at 1167. Furthermore, such evidence of actual confusion when the product is low priced is more valuable because purchasers are more likely to avoid the brand in the future than complain. Union Carbide Corp. v. Ever-Ready, Inc., 531 F.2d 366, 383 (7th Cir.), cert. denied, 429 U.S. 830, 97 S.Ct. 91, 50 L.Ed.2d 94 (1976). The SR 210 may be considered a moderately priced item. The return to Zebco is nonetheless an indication of confusion; not only did the purchaser have to return the reel for repair but he also had to include $1.75 repair charge. Record, vol. 3, at 100. The trial court did not err in relying on such evidence.
 
 
 30
 Spinit makes two objections with respect to the survey, conducted by Dr. Sorenson, which Brunswick introduced to support its theory of confusion. Individuals in shopping areas in five cities were shown a Spinit SR 210 reel and asked several questions about the reel, including who was the manufacturer, and what made the individual name a particular manufacturer. Spinit argues the survey should not have been admitted; and second, if admissible, the trial court should not have relied on its results. The trial court did not abuse its discretion in admitting the survey. Survey evidence may be admitted as an exception to the hearsay rule if the survey is material, more probative on the issue than other evidence and if it has guarantees of trustworthiness.[5] See Fed.R.Evid. 803(24); Pittsburgh Press Club v. United States, 579 F.2d 751, 758 (3d Cir.1978); Zippo Mfg. Co. v. Rogers Imports, Inc., 216 F.Supp. 670, 683-84 (S.D.N.Y.1963); 5 J. Weinstein & M. Berger, Weinstein's Evidence p 901(b)(9) at 901-118 (1983).
 
 
 31
 In a case such as this in which confusion as to product source is a material issue, a survey may be the only available method of showing the public state of mind. 5 J. Weinstein & M. Berger, Weinstein's Evidence, p 901(b)(9) at 901-120. The survey is trustworthy if it is shown to have been conducted according to generally accepted survey principles. Id.; Pittsburgh Press Club, 579 F.2d at 758. The record reflects that adequate foundation was laid to admit the survey. Record, vol. 3, at 165-85. Spinit's own expert, Dr. Vanderslice, testified that the survey "appeared to be conducted along reasonably acceptable market research techniques." Record, vol. 11, at 260.
 
 
 32
 As to the technical and methodological deficiencies in the survey that Spinit charges, those relate not the survey's admissibility but to the weight to be given such evidence. See Standard Oil v. Standard Oil, 252 F.2d 65, 75 (10th Cir.1958); Mobil Oil v. Pegasus Petroleum Corp., 818 F.2d 254, 259 (2d Cir.1987); Lois Sportswear, U.S.A. v. Levi Strauss & Co., 799 F.2d 867, 875 (2d Cir.1986). None of the flaws that Spinit lists supports its claim that the trial court's reliance on the survey is clearly erroneous; particularly in light of Dr. Vanderslice's response when asked if he would have conducted the survey differently: "Oh, there may be a few little minor word changes, a few little minor order of the questionnaires, but nothing significant. They would just be professional differences of opinions." Record, vol. 11, at 279. Spinit's many other criticisms of the survey also fail to show that the trial court abused its discretion.[6]
 
 
 33
 Spinit has not overcome its burden to show that the trial court was clearly erroneous when it determined that (1) the shape of the Zebco 33 is nonfunctional and (2) there is a likelihood of confusion as to the source of the Spinit SR 210. The district court's finding that Spinit violated the Lanham Act is affirmed.
 
 C. Laches
 
 34
 Spinit appeals the trial court rejection of its defense of laches. Laches consists of two elements: (1) inexcusable delay in instituting suit; and (2) resulting prejudice to defendant from such delay. University of Pittsburgh v. Champion Products, Inc., 686 F.2d 1040, 1044 (3d Cir.), cert. denied, 459 U.S. 1087, 103 S.Ct. 571, 74 L.Ed.2d 933 (1982). The defense is an issue primarily addressed to the trial court's discretion; thus we may not disturb the trial court's ruling in the absence of abuse of that discretion. Jicarilla Apache Tribe v. Andrus, 687 F.2d 1324, 1337 (10th Cir.1982); Standard Oil, 252 F.2d at 77.
 
 
 35
 Spinit argues that Brunswick knew Spinit planned to enter the spin-cast reel market with a reel similar to and competitive with the Zebco 33. Because Brunswick failed to notify Spinit of its objection until Spinit "had begun to be competitive to the point of manufacturing and shipping production models of its reels," Brunswick inexcusably delayed proceedings.
 
 
 36
 The general manager for Zebco testified that in July of 1982 he received a memo that Spinit planned to produce several reels based on the same inner mechanical designs as the Zebco 33, but he did not imagine the exterior of Spinit's product would look like the 33. Record, vol. 10, at 35-37. A former sales manager at Zebco testified that he was told, and informed his superiors, in the spring of 1982 that Spinit planned to "knockoff" the Zebco 33. He did not see the actual reel, however, until early 1983. Record, vol. 13, at 466-69. No evidence suggests anyone at Zebco saw the reel before January 1983 when a newspaper article featured Mr. McIntyre holding an SR 210. Zebco filed its suit two months later. We cannot see how Zebco could have acted sooner. If no one had seen the reel, no one knew if the "knockoff" was of the inner workings or also included the exterior design. Once Zebco saw that the SR 210 looked similar to the 33, and that the SR 210 was actual competition, it acted promptly. See Standard Oil, 252 F.2d at 77. Moreover, even if we assumed Zebco could have begun an action upon notice of Spinit's intentions, Zebco's delay of one year does not necessarily constitute laches. See AmBrit, Inc. v. Kraft, Inc., 812 F.2d 1531, 1546 (11th Cir.1986), cert. denied, --- U.S. ----, 107 S.Ct. 1983, 95 L.Ed.2d 822 (1987) (implying that delay of less than two years would not constitute laches); Piper Aircraft Corp. v. Wag-Aero, Inc., 741 F.2d 925, 933 (7th Cir.1984) (two years has rarely been held sufficient delay to establish laches); Black Hills Jewelry Mfg. v. Gold Rush, Inc., 633 F.2d 746, 754 (8th Cir.1980) (eighteen months between defendant's first use of trade name and plaintiff's suit was insufficient delay to establish laches); Carl Zeiss Stiftung v. Veb Carl Zeiss Jena, 433 F.2d 686, 704 (2d Cir.1970), cert. denied, 403 U.S. 905, 91 S.Ct. 2205, 29 L.Ed.2d 680 (1971) (mere passage of time does not constitute laches; defendant must also have been lulled into false sense of security and act in reliance). The trial court did not abuse its discretion.
 
 D. Injunction
 
 37
 After finding that Spinit had violated the Lanham Act, the trial court enjoined the company from:
 
 
 38
 producing and selling any spincast fishing reel in the present configuration of the Spinit SR-210 or any other spincast reel having an appearance confusingly similar to or identical to the Zebco Model 33 spincast fishing reel ... [and] from any further distribution of any packaging or other printed materials which infringe one or more of [Zebco's] copyrights....
 
 
 39
 Amended Findings of Fact and Conclusions of Law, record, vol. 1, at 495-96.
 
 
 40
 Spinit argues that the injunction should be vacated because it was granted for the wrong reason and because Spinit has rectified the design problem and is not likely to repeat it. Brief of Appellees and Cross-Appellants at 36-37. Claiming that the district court gave no basis for granting the injunction, Spinit asserts that it was enjoined as punishment. The court, however, explained its reasoning in the Amended Findings of Fact and Conclusions of Law: an injunction is warranted if consumers are likely to confuse a Spinit SR 210 with a Zebco 33, record, vol. 1, at 494, and consumers are likely to believe that the Spinit SR 210 is manufactured by Zebco because of the similarity of the reels. Id. at 492. The trial court applied the appropriate test for issuing an injunction in this case. See Schutt Mfg. Co. v. Riddell, Inc., 673 F.2d 202, 206 (7th Cir.1982); Black Hills Jewelry Mfg. Co. v. Gold Rush, Inc., 633 F.2d 746, 753-54 (8th Cir.1980); Quabaug Rubber Co. v. Fabiano Shoe Co., 567 F.2d 154, 160 (1st Cir.1977). We find no basis for Spinit's claim of punishment.
 
 
 41
 In reviewing a district court order for injunction, an appellate court generally must look for abuse of discretion. See Lemon v. Kurtzman, 411 U.S. 192, 200, 93 S.Ct. 1463, 1469, 36 L.Ed.2d 151 (1973); Tri-State Generation and Transmission Assoc. v. Shoshone River Power, Inc., 805 F.2d 351, 354 (10th Cir.1986); Schutt Mfg. Co., 673 F.2d at 207. Spinit argues that injunctive relief is unnecessary because by drastically altering the SR 210 cover, it solved the confusion problem in the design. See Burndy Corp. v. Teledyne Indus., Inc., 748 F.2d 767, 774 (2d Cir.1984). Regardless of whether the unfair conduct has stopped and is not likely to recur, the trial court still has the discretion to grant or deny an injunction against such conduct. Schutt Mfg. Co., 673 F.2d at 207. The district court ruled that the two models of the SR 210 that Spinit had manufactured at the time the suit was brought were likely to confuse customers that they were made by Zebco. We find no abuse of discretion in the court's granting of an injunction.
 
 E. Damages
 
 42
 The district court found that, although Brunswick established a legal basis for damages, it failed to establish clear proof of damages. Amended Findings of Fact and Conclusions of Law, record, vol. 1, at 494. The court gave no other basis for its conclusion.
 
 
 43
 Although damages may be awarded for a violation of section 43(a), the award is distinguishable from injunctive relief, because plaintiff bears a greater burden of proof of entitlement. Likelihood of confusion is insufficient; to recover damages plaintiff must prove it has been damaged by actual consumer confusion or deception resulting from the violation. Schutt Mfg. Co., 673 F.2d at 206; see also Quabaug Rubber Co., 567 F.2d at 161-62. Actual consumer confusion may be shown by direct evidence, a diversion of sales or direct testimony from the public, or by circumstantial evidence such as consumer surveys. PPX Enters. Inc. v. Audiofidelity Enters., Inc., 818 F.2d 266, 271 (2d Cir.1987); Schutt Mfg. Co., 673 F.2d at 206-07; Bangor Punta Operations, Inc. v. Universal Marine Co., 543 F.2d 1107, 1110 (5th Cir.1976).
 
 
 44
 Although the quantum of damages, as distinguished from entitlement, must be demonstrated with specificity, courts may engage in "some degree of speculation in computing the amount of damages, particularly when the inability to compute them is attributable to the defendant's wrongdoing."
 
 
 45
 PPX Enters. Inc., 818 F.2d at 271 (citations omitted) (quoting Burndy Corp., 748 F.2d at 771).
 
 
 46
 The district court found that there was actual confusion among consumers and retailers, Amended Findings of Fact and Conclusions of Law, record, vol. 1, at 490, and that Zebco and Spinit sell reels in the same marketing channels, in direct competition with each other. Id. Those findings support the court's determination that Brunswick established a legal basis for the recovery of damages, indicating that actual consumer confusion resulted from Spinit's violation of section 43(a). Nevertheless, by adding that Brunswick did not establish clear proof of damages, the court implies that Brunswick presented insufficient proof of actual damages. The court more likely meant that, although Brunswick established entitlement to damages, it failed to show that it suffered damages in fact.
 
 
 47
 Brunswick submitted evidence that in the fiscal year ending July 1983 sales of all Zebco spin-cast products dropped off by five percent, record, vol. 10, at 14, sales of spin-cast reels generally had decreased by six percent due to the recession. Id. at 15. Sales for the Zebco 33, however, dropped sixteen percent. Id. Spinit introduced testimony that the introduction of other new reels on the market might have contributed to the decrease in Zebco's sales. However, in light of the trial court's finding of actual confusion and direct competition between the reels, we are not persuaded that other reels were the sole cause of the substantial reduction in the sale of the Zebco 33. Thus, the evidence does not indicate that Brunswick failed to show it suffered any actual damages.
 
 
 48
 A defendant whose wrongful conduct has caused the difficulty in assessing damages cannot complain that the damages are somewhat speculative. Eastman Kodak Co. v. Southern Photo Materials Co., 273 U.S. 359, 379, 47 S.Ct. 400, 405, 71 L.Ed. 684 (1927). See also DeVries v. Starr, 393 F.2d 9, 20-21 (10th Cir.1968). Evidence of the amount of damages may be circumstantial and inexact. Eastman Kodak Co., 273 U.S. at 379, 47 S.Ct. at 405.
 
 
 49
 [I]n a case such as this, where the wrong is of such a nature as to preclude exact ascertainment of the amount of damages, plaintiff may recover upon a showing of the extent of the damages as a matter of just and reasonable inference, although the result may be only an approximation.
 
 
 50
 Bangor Punta Operations, Inc., 543 F.2d at 1110-11 (quoting Kestenbaum v. Falstaff Brewing Corp., 514 F.2d 690, 698 (5th Cir.1975), cert. denied, 424 U.S. 943, 96 S.Ct. 1412, 47 L.Ed.2d 349 (1976)); see also Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 563, 51 S.Ct. 248, 250, 75 L.Ed. 544 (1931).
 
 
 51
 Brunswick bases its claim for damages on the theory that Zebco lost one sale of a Model 33 as a result of each Spinit SR 210 reel sold. While this court does not necessarily believe that each Spinit sale resulted in a corresponding loss of sale by Zebco, the theory provides an upper range for an award of damages. The district court may also look to the difference in the decline of Model 33 sales as compared with the decline in sales of Zebco's other spin-cast reels. Those items of evidence provide the court a broad basis from which it may arrive at a fair, if not precise, amount with which to compensate Brunswick for wrongful infringement. We reverse the trial court's finding on damages and remand for findings of the amount of damages due.
 
 
 52
 Brunswick also appeals from the trial court's denial of its motion for post-trial discovery. After trial but before final judgment, Spinit continued to sell SR 210 reels. Brunswick moved for permission to discover the number of reels sold and the profits earned by Spinit during that period.
 
 
 53
 "Trademark infringement is a continuous wrong and, as such, gives rise to a claim for relief so long as the infringement persists." James Burrough Ltd. v. Sign of the Beefeater, Inc., 572 F.2d 574, 578 (7th Cir.1978). See also 4 Callmann, Unfair Competition Trademarks and Monopolies, Sec. 22.50 at 260 (4th ed. 1983) [Callmann]. Thus, Brunswick is entitled to damages until the time the wrongful infringement ceased. The trial court had jurisdiction to award damages up to the date of final judgment, see Rea v. Ford Motor Co., 560 F.2d 554, 557 (3d Cir.), cert. denied, 434 U.S. 923, 98 S.Ct. 407, 54 L.Ed.2d 281 (1977), and it could permit discovery to determine those damages until the same date. Brunswick is, therefore, entitled to reasonable discovery, consistent with the trial court's determination of damages, to ascertain the amount of damages suffered after the end of trial and before final judgment.
 
 II. Oklahoma Deceptive Trade Practices Act
 
 54
 The district court held that Spinit's manufacture of the SR 210 did not constitute a deceptive trade practice within the Oklahoma Deceptive Trade Practices Act. Okla.Stat.Ann. tit. 78 Sec. 53(a)(1) (West 1987). Amended Findings of Fact and Conclusions of Law, record, vol. 1, at 495. Brunswick claims the court abused its discretion in so holding because a person engaging in a deceptive practice or unfair competition in violation of the Lanham Act also violates the Oklahoma Act.[7]
 
 
 55
 Brunswick claims that Spinit's conduct constitutes "passing off", a deceptive trade practice under Okla.Stat.Ann. tit. 78 Sec. 53(a)(1) (West 1987). The concept of passing off developed from the common law tort of fraud and deceit. Sicilia Di R. Biebow & Co., 732 F.2d at 431. Some jurisdictions have considered passing off to constitute the whole law of unfair competition. 1 Callmann Sec. 2.02 at 2-6 & n. 4 (4th ed. 1981). "Today, however, 'passing off is merely a single type of theory within the broad spectrum of unfair competition law.' " Sicilia Di R. Biebow & Co., 732 F.2d at 431 (quoting 2 J. McCarthy, Trademarks and Unfair Competition Sec. 25:1 at 170 (1973)). Even so, unfair competition actions are often determined on the basis of whether the defendant passed off his goods as those of another. See, e.g., Fisher v. Dees, 794 F.2d 432, 440 (9th Cir.1986); Kazmaier v. Wooten, 761 F.2d 46, 52 (1st Cir.1985); Sun-Fun Products, Inc. v. Suntan Research & Development, Inc., 656 F.2d 186, 192 (5th Cir.1981).
 
 
 56
 Section 43(a) of the Lanham Act proscribes unfair competitive practices involving potential or actual deception and is considered to proscribe passing off. SK & F Co., 625 F.2d at 1065. Thus we hold that Section 53(a)(1) of the Oklahoma Act which names passing off as a deceptive trade practice requires the same standards of proof as does an action under Section 43(a) of the Lanham Act. See also Sicilia Di R. Biebow, 732 F.2d at 431 n. 10 (in determining an action for unfair competition most courts adopt the test of likelihood of confusion rather than fraudulent passing off); V.I.P. Foods, Inc. v. Vulcan Pet, Inc., 210 U.S.P.Q. 662, 668 (N.D.Okla.1980) (implicity using a likelihood of confusion test under the Lanham Act as sufficient to prove a violation of Section 53(a)(1)) rev'd on other grounds, 675 F.2d 1106 (10th Cir.1982); Hydril Co. v. Blowout Prevention, Inc., 221 U.S.P.Q. 1153, 1158 (W.D.Okla.1983) (same); Petersen v. Fee Int'l Ltd., 381 F.Supp. 1071, 1080 (W.D.Okla.1974); see also Bell v. Davidson, 597 P.2d 753, 755 (Okla.1979) (requiring a likelihood of confusion test to prove unfair competition).[8] Thus, by proving a violation of section 43(a) of the Lanham Act, Brunswick has offered sufficient evidence to prove a violation of Section 53(a)(1) of the Oklahoma Deceptive Trade Practices Act.[9]
 
 
 57
 We need not reach the issue of damages under the Oklahoma Act as separate recovery would be duplicative. The only matter which may be affected by this conclusion is the issue of attorney's fees.
 
 III. Attorney's Fees
 
 58
 Brunswick seeks attorney's fees under both the Lanham Act and the Oklahoma Act. In the initial Findings of Fact and Conclusions of Law, record, vol. 1, at 324, the district court made no mention of whether Brunswick was entitled to attorney's fees under the Lanham Act. However, the district court did grant Brunswick attorney's fees under 17 U.S.C. Sec. 505. Id., vol. 1, at 339.
 
 
 59
 Title seventeen of the United States Code relates to copyright actions, and section 505 allows "the court in its discretion" to "award a reasonable attorney's fee to the prevailing party" in civil actions for copyright infringement. 17 U.S.C. Sec. 505 (1982). Brunswick's action is not a copyright action under title seventeen, but rather an unregistered trademark action brought under the Lanham Act, codified under title fifteen. The granting of attorney's fees under title seventeen was inappropriate.
 
 
 60
 Attorney's fees may be awarded, under certain circumstances, under the Lanham Act. Prior to 1975, the Lanham Act (15 U.S.C. Secs. 1051-1127) contained no provision for the awarding of attorney's fees, and the United States Supreme Court had ruled that the judicial granting of attorney's fees was improper under the Lanham Act because the granting of fees was not contained in the language of the Act and because "Congress intended Sec. 35 of the Lanham Act to mark the boundaries of the power to award monetary relief in cases arising under the Act." Fleischmann Distilling Corp. v. Maier Brewing Co., 386 U.S. 714, 721, 87 S.Ct. 1404, 1409, 18 L.Ed.2d 475 (1967).
 
 
 61
 In 1975, Congress responded to the Fleischmann ruling and amended section 35 to permit "[t]he court in exceptional cases [to] award reasonable attorney fees to the prevailing party." Act of Jan. 2, 1975, Pub.L. 93-600, Sec. 3, 88 Stat. 1955, codified as 15 U.S.C. Sec. 1117 (1982). Section 35, by its language, is limited to awarding attorney's fees "[w]hen a violation of any right of the registrant of a mark registered in the Patent and Trademark Office shall be established in any civil action arising under this chapter." 15 U.S.C. Sec. 1117 (1982) (emphasis added). Although Brunswick's action arises under the Lanham Act, it does not involve the right of a registered mark. Section 43(a) creates a cause of action for infringement of unregistered marks, and there has been no congressional amendment to the Lanham Act providing for the awarding of attorney's fees in an action involving an unregistered mark.
 
 
 62
 This court has not previously been confronted with the issue of whether the remedies of section 35 of the Lanham Act also apply to section 43(a) of the Act. Other circuit courts addressing this issue have concluded that Congress must have intended that section 35 remedies apply to section 43(a). Transgo, Inc. v. AJAC Transmission Parts Corp., 768 F.2d 1001, 1025-27 (9th Cir.1985), cert. denied, 474 U.S. 1059, 106 S.Ct. 802, 88 L.Ed.2d 778 (1986) ("[T]he congressional purpose of uniformity and simplicity in trademark laws could be furthered only if attorneys' fees were recoverable under section 43(a)."); Standard Terry Mills, Inc. v. Shen Mfg. Co., 803 F.2d 778, 782 (3d Cir.1986) (Court assumed without holding that Sec. 35 applied to Sec. 43(a). "[We] have doubts whether we should rectify Congress's oversight and hold that attorney's fees are available in this case."); WSM, Inc. v. Wheeler Media Serv., Inc., 810 F.2d 113, 116 (6th Cir.1987); (section 35 remedies, "including attorney's fees," apply to section 43(a) actions); Rickard v. Auto Publisher, Inc., 735 F.2d 450 (11th Cir.1984) (same); Co-Rect Products, Inc. v. Marvy! Advertising Photography, Inc., 780 F.2d 1324, 1331 (8th Cir.1985) (same); Metric & Multistandard Components Corp. v. Metric's, Inc., 635 F.2d 710, 715 (8th Cir.1980) (same). Although these decisions completely ignore strict construction of the Lanham Act and are a wholesale judicial creation of remedies that Congress has not expressly provided for, we are not inclined to create a split in the circuit courts, and thus conclude that section 35 remedies apply to section 43(a) provisions. Accordingly, attorney's fees may be granted to the prevailing party in section 43(a) actions in exceptional cases. This court has previously ruled that an exceptional case "is one in which the trademark infringement can be characterized as 'malicious,' 'fraudulent,' 'deliberate,' or 'willful.' " VIP Foods, Inc. v. Vulcan Pet, Inc., 675 F.2d 1106, 1107 (10th Cir.1982); see also Transgo, Inc., 768 F.2d at 1026; Metric & Multistandard Components Corp., 635 F.2d at 716; but see USM, Inc., 810 F.2d at 116 (exceptional means less than "bad faith"; it means "unmcommon, not run-of-the-mine"). As we conclude below, the element of being "exceptional" i.e. willful, etc., is not present in Spinit's actions. We thus rule that Brunswick is not entitled to attorney's fees under section 43(a) of the Lanham Act.
 
 
 63
 The Oklahoma Deceptive Trade Practices Act permits the recovery of attorney's fees at the court's discretion but requires an award of attorney's fees only if the court finds defendant has willfully engaged in a deceptive trade practice. Okla.Stat.Ann. tit. 78 Sec. 54(b) (West 1987). The trial court found that defendant had not "willfully engaged in a deceptive trade practice such as would entitle plaintiff to an award of attorney fees ... under Sec. 54(b)." Amended Findings of Fact and Conclusions of Law, record, vol. 1, at 495. A fair reading of the court's findings and conclusions indicates that it interprets "willful" to require some consciousness of unlawful behavior. Thus, the court concluded that intentional copying of the design alone did not, as a matter of law, establish that the copying was done with a sense of invasion of protected rights. The Oklahoma cases applying section 54(b) shed no light on the issue. Two cases have affirmed the award of attorney's fees upon the trial court's finding that defendant "willfully engaged in deceptive trade practices" without articulating the nature of the willful conduct. See Paddington Corp. v. Major Brands, Inc., 359 F.Supp. 1244, 1251 (W.D.Okla.1973); Bell v. Davidson, 597 P.2d 753, 756 (Okla.1979). Moreover, neither court needed to carefully examine the trial court's finding because each commented that, in the absence of willful actions, a court still has the discretion to award attorney's fees, and in neither case had the trial court abused its discretion. Paddington, 359 F.Supp. at 1251; Bell, 597 P.2d at 756.
 
 
 64
 Because attorney's fees are usually a statutory exception to the general rule, we believe the Oklahoma legislature intended the more restrictive view. Mere absence of mistake, accident or involuntariness does not establish willfulness. If a court determines that attorney's fees are appropriate, although it finds defendant was not actually conscious of encroaching upon protected rights, it is not required to award attorney's fees. We cannot say that the trial court's conclusion that Spinit's intent did not amount to willfulness as thus understood is clearly erroneous.
 
 
 65
 Although attorney's fees are not required in this action, the district court may, under the Oklahoma Act, exercise its discretion and permit attorney's fees. This court is uncertain whether the district court's attempt to award discretionary attorney's fees under 17 U.S.C. Sec. 505 (1982) reveals the district court's intent to grant attorney's fees if there is any statutory basis for doing so. We therefore remand this issue to the district court to rule, according to its discretion, whether attorney's fees are to be granted under the Oklahoma Act.
 
 IV. The License Agreement
 
 66
 On July 21, 1982, Spinit signed a license agreement with the R.D. Hull Company which protected Spinit from being sued for infringement of two United States patents. In consideration, the agreement requires Spinit to pay royalty fees on the sale of licensed fishing reels or a minimum of $5,000 per calendar quarter. The R.D. Hull Company assigned its interest in the license agreement to Brunswick on February 10, 1983. Although Spinit issued two checks to Brunswick for the two quarters following the assignment, it stopped payment on both checks. Spinit then notified Brunswick that it was terminating the agreement effective September 24, 1983. Brunswick argued that it was entitled to judgment for the payments due for two full quarters of 1983 and a prorated amount for the portion of the third quarter before the agreement was terminated.
 
 
 67
 The district court's initial Findings of Fact and Conclusions of Law omitted any mention of the sum Brunswick demanded. The court denied Brunswick's motion to amend the judgment to include an award under the agreement. We find the court's denial contrary to law.
 
 
 68
 Spinit argues that it thought the license agreement entitled it to copy the Zebco Model 33 and, therefore, the agreement was unenforceable due to (1) mutual mistake between the parties and (2) Spinit's failure to receive the consideration it had bargained for. The trial court found, however, that the agreement granted no right to copy the Zebco 33 and denied Spinit's motion to amend the findings to state Spinit's belief that the agreement did grant such a right. Amended Findings of Fact and Conclusions of Law, record, vol. 1, at 484-85. Thus, the court found Spinit was not mistaken as to the meaning of the agreement. The evidence does not indicate that the finding was error.
 
 
 69
 Because the agreement was enforceable, the court erred in failing to award Brunswick the amount due under the agreement. The amount is not disputed. The issue is remanded to the trial court with instructions to enter judgment for $14,673.91 plus appropriate interest.
 
 Conclusion
 
 70
 The case is reversed in part and remanded for further proceedings.
 
 APPENDIX 1
 
 71
 (Plaintiff's exhibit 1, record, vol. 1A)
 
 
 72
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 APPENDIX 2
 
 73
 (Plaintiff's exhibit 2, record, vol. 1A)
 
 
 74
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 
 
 *
 Honorable Wesley E. Brown, United States Senior District Judge for the District of Kansas, sitting by designation
 
 
 [1]
 The section provides:
 Any person who shall affix, apply, or annex, or use in connection with any goods or services, or any container or containers for goods, a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause such goods or services to enter into commerce, and any person who shall with knowledge of the falsity of such designation of origin or description or representation cause or procure the same to be transported or used in commerce or deliver the same to any carrier to be transported or used, shall be liable to a civil action by any person doing business in the locality falsely indicated as that of origin or in the region in which said locality is situated, or by any person who believes that he is or is likely to be damaged by the use of any such false description or representation.
 15 U.S.C. Sec. 1125(a) (1982).
 
 
 [2]
 While some circuits seem to require the product have a secondary meaning, see, e.g., American Greetings Corp., 807 F.2d at 1141; Prufrock Ltd. v. Lasater, 781 F.2d 129, 133 (8th Cir.1986); Kwik-Site Corp. v. Clear View Mfg. Co., 758 F.2d 167, 178 (6th Cir.1985); Industria Arredamenti Fratelli Saporiti v. Charles Craig, Ltd., 725 F.2d 18, 19 (2d Cir.1984); Vuitton et Fils S.A. v. J. Young Enters., Inc., 644 F.2d 769, 772 (9th Cir.1981); Keebler Co. v. Rovira Biscuit Corp., 624 F.2d 366, 378 (1st Cir.1980), other circuits have held that secondary meaning need not be shown if the trade dress, by itself, is inherently distinctive. Vaughan Mfg. Co. v. Brikam Int'l, Inc., 814 F.2d 346, 348 (7th Cir.1987); AmBrit, Inc. v. Kraft, Inc., 812 F.2d 1531, 1535-36 (11th Cir.1986), cert. denied, --- U.S. ----, 107 S.Ct. 1983, 95 L.Ed.2d 822 (1987); Sno-Wizard Mfg., Inc. v. Eisemann Prods. Co., 791 F.2d 423, 425 n. 2 (5th Cir.1986). This court has suggested that an inherently distinctive mark is sufficient, see J.M. Huber Corp. v. Lowery Wellheads, Inc., 778 F.2d 1467, 1470 (10th Cir.1985), but we need not address the issue because defendant does not challenge the trial court's holding that the trade dress of the Zebco Model 33, the distinctive shape of its front cover, has secondary meaning
 
 
 [3]
 The Second Circuit did not reject the important ingredient test in all cases. The implication in LeSportsac, Inc., however, is that the factfinder must always also consider whether that ingredient primarily identifies the product source
 
 
 [4]
 Spinit claims that Brunswick advertises the utilitarian nature of its cover; however, the evidence of advertising in the record concerns the Zebco 2020 reel, not the Zebco 33. Record, vol. 6, at 307. Spinit also claims that another cover design would be twice as expensive to produce. Record, vol. 12, at 398-400. The evidence to support double costs relates only to Spinit's and Zebco's current manufacturer reproducing plaintiff's proposed alternative design. No evidence clearly shows that another manufacturer could not do it for less. The record also indicates that Spinit might have to pay $20,000 in tooling costs to make a different cover. Although this appears to be a substantial sum of money, it is a start-up cost that Spinit avoided paying in the first place only because, by copying the Zebco 33 cover, Spinit could use tooling that had already been set up for the Zebco 33. The shape of the cover did not make it less expensive to produce, the fact that it had already been set up for production did
 Although several of Spinit's witnesses testified that consumers currently seem to prefer a reel with a cone-shaped front cover, no evidence indicates that any cone shape other than the forty degree angle on the Zebco 33 would be unmarketable. Furthermore, two of the ten most recent reel models in 1982 were not cone shaped. Id., vol. 11, at 120, and one witness testified that the Zebco shape was not the most modern. Id., vol. 3, at 31.
 Spinit's contention that the proposed front covers when placed on Spinit's back cover would not fit all standard rods is equally meritless. The Zebco 33 does not fit on all standard rods, nor does any other reel on the market. Id., vol. 13, at 634; vol. 12, at 336.
 Spinit maintains that the groove in the front cover is functional. Brunswick does not dispute that contention. Nevertheless, a witness for the defense admitted that a groove of the same dimension placed on any of the proposed covers would solve the problem necessitating a groove on the Zebco 33. Id., vol. 6, at 417.
 Spinit's final argument is that the cone-shaped cover of the Zebco 33 casts farther than do the proposed covers or other covers in the market. Some evidence supports Spinit's contention, see, e.g., id., vol. 13, at 528-31. Other evidence, however, indicates that the shape formed by the line as it flows out of the reel will be essentially the same no matter what shape the cover is. The line will hit the inside of the cover and will not cast better depending on where it touches the inside cover. Id., vol. 14, at 697-700. Further testimony indicated no difference in casting between different hoods, id., vol. 10, at 96-97, or, in fact, better results with a rounded hood, vol. 4, at 162.
 None of these arguments suggests that the trial court made a mistake. We are unable to reach any different conclusion with respect to Spinit's argument that an expired utility patent is proof of the functionability of the cover. The exhibit was not made part of the record on appeal; thus, we have no evidence to indicate the trial court's decision on the issue was erroneous.
 
 
 [5]
 Some survey evidence may be admissible because it is not hearsay; the statements are not offered as proof of the matter asserted but as inference of the individual's state of mind. Certain answers in this survey were not offered to prove the truth of the matter asserted such as "[this reel] is a Zebco," Record, vol. 3, at 189. On the other hand, responses stating that the displayed reel looks like a Zebco, id., vol. 11, at 209, were offered for the truth of the matter asserted. We have, therefore, analyzed the issue of admissibility under the standard mandated by Rule 803(24)
 
 
 [6]
 Spinit claims certain questions in the survey were leading; however, Spinit's own expert testified they were not. Record, vol. 11, at 252-53. Dr. Vanderslice also testified that he used procedures similar to those of Dr. Sorenson when conducting a survey, including the method of selecting and supervising interviewers, compare id., vol. 3, at 207-09 with vol. 11, 255-57, the method of compiling questions, compare id., vol. 3, at 171 with vol. 11, at 268, and the method of validating results, compare id., vol. 3, at 212-13 with vol. 11, at 268-69
 Spinit challenged the universe Dr. Sorenson used for the survey, persons over 14 years who have fished in fresh water in the last twelve months, as too narrow. Spinit offered no evidence to show that such a universe would not be a fair sample of those who are likely to purchase spincast reels and we find no error. See Brooks Shoe Mfg. Co. v. Suave Shoe Corp., 716 F.2d 854, 861 n. 16 (11th Cir.1983) (appropriate universe for survey conducted to determine secondary meaning of symbol on running shoe was households in two cities in which one or more individuals had purchased one or more pairs of athletic shoes during the previous twelve months); Jellibeans, Inc. v. Skating Clubs of Georgia, Inc., 716 F.2d 833, 845 n. 24 (11th Cir.1983) (survey to determine confusion between roller skating rinks interviewed persons at six shopping centers twelve to fourteen who had roller-skated in the last year).
 Spinit argues that the survey results were not projectable. Although the trial court used the survey evidence to project the results, Amended Findings of Fact and Conclusions of Law, record, vol. 1, at 488, it also used the survey as evidence of actual confusion, id., at 487, 490. Because the court used the survey as evidence of actual confusion, see James Burrough Ltd. v. Sign of the Beefeater, Inc., 572 F.2d 574, 578 (7th Cir.1978), and actual confusion is substantial proof of likelihood of confusion, Mobil Oil Corp., 818 F.2d at 259, we need not decide whether the court erred by projecting the survey results.
 The most serious defect in the Sorenson survey, Spinit claims, is that the SR 210 was shown to the interviewees in a package that differed significantly from the SR 210's current package because it had no disclaimer. The package did, however, display Spinit's name on the package and consumers still confused the SR 210 with a Zebco product. Record, vol. 11, at 181. Furthermore, because the reels are often displayed on rods, or individually, but removed from the package, see, e.g., id., vol. 12, at 306-07, a customer may not see the disclaimer until he has taken the reel home. Thus, the presentation does not invalidate the survey. See LeSportsac, Inc., 754 F.2d at 79-80 (where the disclaimer is removable, once it is off the product, the likelihood of confusion returns).
 
 
 [7]
 In its reply, Spinit argues that the preemption doctrine announced in Sears, Roebuck & Co. v. Stiffel Co., 376 U.S. 225, 84 S.Ct. 784, 11 L.Ed.2d 661 (1964), and Compco Corp. v. Day-Brite Lighting, Inc., 376 U.S. 234, 84 S.Ct. 779, 11 L.Ed.2d 669 (1964), prevents Zebco from recovering under state law. Sears and Compco prevent a state from prohibiting the copy and sale of unpatented articles. Sears, 376 U.S. at 232-33, 84 S.Ct. at 789; Compco, 376 U.S. at 238, 84 S.Ct. at 782. Spinit's argument is misguided, however, because both cases clearly reserve to the states the ability to prohibit infringement of trademark or trade dress indicating a product's origin. Sears, 376 U.S. at 232, 84 S.Ct. at 789; Compco, 376 U.S. at 238, 84 S.Ct. at 782. See also SK & F Co. v. Premo Pharmaceutical Lab., 625 F.2d 1055 (3d Cir.1980); Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd., 604 F.2d 200 (2d Cir.1979)
 
 
 [8]
 Although the term "passing off" appears to incorporate intent to deceive, see, e.g., Sicilia Di R. Biebow, 732 F.2d at 431, we do not find such intent a requirement under the Oklahoma Act. The Oklahoma Act, like the Illinois Deceptive Trade Practices Act, was adopted from the 1964 Uniform Deceptive Trade Practices Act, see 7A U.L.A. 299 (1985). The Illinois legislature did not make intent to deceive an element of proof of passing off. See Zeller v. LaHood, 627 F.Supp. 55, 60 (C.D.Ill.1985). We hold the Oklahoma legislature did not require such intent either
 
 
 [9]
 This court has held that the Oklahoma Act requires a further showing that defendant's product is in competition with plaintiff. VIP Foods, Inc. v. Vulcan Pet, Inc., 675 F.2d 1106, 1108 (10th Cir.1982). However, the district court determined that the reels are in direct competition. Amended Findings of Fact and Conclusions of Law, record, vol. 1, at 490. No challenge to that finding has been raised