USCA1 Opinion

 

 
 United States Court of Appeals
 For the First Circuit
 
 ____________________
 
 No. 98-1334
 
 I.P. LUND TRADING ApS and KROIN INC.,
 
 Plaintiffs, Appellees,
 
 v.
 
 KOHLER CO. and ROBERN, INC.,
 
 Defendants, Appellants.
 
 ____________________
 
 No. 98-1492
 
 I.P. LUND TRADING ApS and KROIN INC.,
 
 Plaintiffs, Cross-Appellants,
 
 v.
 
 KOHLER CO. and ROBERN, INC.,
 
 Defendants, Cross-Appellees.
 
 ____________________
 
 APPEALS FROM THE UNITED STATES DISTRICT COURT
 
 FOR THE DISTRICT OF MASSACHUSETTS
 
 [Hon. Nancy Gertner, U.S. District Judge]
 ____________________
 
 Before
 
 Torruella, Chief Judge,
 Boudin and Lynch, Circuit Judges.
 ____________________
 
 
 David H. Gibbs, with whom Cornelius J. Moynihan, John
 V. Snellings, Jason C. Kravitz, and Peabody & Brown were on
 briefs, for plaintiffs.
 Hugh Latimer, with whom Michael L. Sturm, Karyn K.
 Ablin, Wiley, Rein & Fielding, Stephen H. Lash, Jager, Smith &
 Stetler, James R. Kieckhefer, and Kohler Co. were on briefs,
 for defendants.
 
 ____________________
 
 
 December 22, 1998
 
 ____________________
 
 LYNCH, Circuit Judge. This is an appeal from the
 district court's issuance of a preliminary injunction enjoining
 defendants Kohler Company and Robern, Inc. from selling the
 Kohler Falling Water faucet, a faucet resembling plaintiff
 Lund's VOLA faucet. The VOLA faucet mounts on a wall, has been
 in the design collection at the Museum of Modern Art, and has
 a certain cachet among those who enjoy bathrooms and kitchens
 beautiful. Kohler intended to produce a faucet like Lund's,
 but not identical to it, and hence designed the now-enjoined
 Falling Water faucet. There were two basic claims before the
 trial court: that the Falling Water faucet "diluted" the VOLA
 faucet's trade dress within the meaning of the Federal
 Trademark Dilution Act of 1995 ("FTDA"), 15 U.S.C. 1125(c),
 and that the Falling Water faucet infringed the VOLA's trade
 dress. Lund won a preliminary injunction on the first ground,
 but not on the second. See I.P. Lund Trading ApS v. Kohler
 Co., 11 F. Supp. 2d 112, 127 (D. Mass. 1998) ("Lund I").
 This difference in results was not anomalous. The
 district court found, as to the infringement claim, that while
 the VOLA faucet was not inherently distinctive, it had acquired
 secondary meaning and thus was protectable, but that there was
 no infringement because there was no confusion on the part of
 consumers. In contrast, under the FTDA, where no confusion
 need be shown, the court found the VOLA faucet was famous and
 that Kohler's faucet diluted the identity of the VOLA faucet.
 This case presents complex issues arising in areas of
 intellectual property law recently extended and not yet well
 demarcated. Few courts of appeals have yet interpreted the
 FTDA and this court has never addressed certain key issues,
 under both the infringement and FTDA claims, necessary to the
 resolution of the case. The district court wrote thoughtfully,
 and, particularly as to the FTDA issues, without much appellate
 guidance. The claim for protection here comes not from
 traditional marks such as names but from the very design of the
 faucet itself -- that design is said to give the faucet its
 identity and distinctiveness. Although Lund may have been able
 to obtain a design patent and so protect its VOLA faucet in
 that way, at least for a period of fourteen years, see 35
 U.S.C. 173, it chose not to. Rather, it chose to turn for
 protection to legal doctrines of trademark and trade dress,
 originally crafted without product designs in mind. The trade
 dress of product designs, unlike other forms of trade dress,
 cannot be separated from the product itself. Kohler has raised
 serious constitutional concerns, saying that this use of the
 FTDA against a competing product essentially gives a perpetual
 monopoly to product design, a perpetual monopoly prohibited by
 the Patent Clause. 
 Kohler and Robern (collectively "Kohler") argue that
 the district court erred in its determination that plaintiffs
 I.P. Lund Trading ApS and Kroin Incorporated (collectively
 "Lund") demonstrated a likelihood of success on the merits of
 their claim under the FTDA that the Falling Water faucet
 dilutes the trade dress of Lund's VOLA faucet. Lund cross-
 appeals, arguing that the district court erred in determining
 that Lund was unlikely to succeed on the merits of its
 infringement claim. We affirm the denial of the preliminary
 injunction on the infringement claim. We vacate the grant of
 the injunction on the FTDA claim.
 Several questions of first impression are resolved in
 this opinion. We hold that the burden of showing non-
 functionality of a product for which trade dress protection is
 sought rests on the party seeking that protection. Here that
 is the plaintiff Lund. In analyzing inherent distinctiveness
 in the context of product design, we hold that while the well-
 known Abercrombie test provides a useful analogy, strict
 application of the test is not required; we reiterate this
 court's adherence to the Seabrook Foods test. We emphasize
 that, in any case where the trade dress is said to arise from
 the product design, there must be separate analyses as to (1)
 whether a design is inherently distinctive and (2) whether it
 has nonetheless acquired distinctiveness through secondary
 meaning. As to secondary meaning said to stem from the design
 of the product itself, we hold that the plaintiff must show
 that the primary significance of the design is to signify its
 source. 
 Under the FTDA, we hold that a party who wishes to
 establish fame of the trade dress for which protection is
 sought bears a significantly greater burden than the burden of
 establishing distinctiveness for infringement purposes. The
 FTDA creates an exceptional anti-dilution remedy for truly
 famous marks. Once this greater burden of establishing fame
 has been met under the FTDA, the issue of dilution must be
 addressed. We reject the use of the "Sweet factors" as the test
 for dilution and instead require an inquiry into whether target
 customers will perceive the products as essentially the same. 
 We hold that the dilution standard is a rigorous one, and Lund
 has not shown that it is likely to succeed. While we
 acknowledge serious constitutional concerns about application
 of the FTDA to a dilution claim against a competing product
 which does not confuse consumers, the resolution of the case
 obviates the as applied constitutional issue, and we decline to
 address any residual facial challenge.
 I. Standard of Review
 The district court "enjoys considerable discretion"
 in determining whether to grant a preliminary injunction, but
 its decision "must be supported by adequate findings of fact
 and conclusions of law." TEC Eng'g Corp. v. Budget Molders
 Supply, Inc., 82 F.3d 542, 544-45 (1st Cir. 1996); see alsoCamel Hair & Cashmere Inst. of America, Inc. v. Associated Dry
 Goods Corp., 799 F.2d 6, 12-13 (1st Cir. 1986). "On appellate
 review of the grant or denial of a preliminary injunction, the
 deferential standard of 'abuse of discretion' applies to
 judgment calls, by the district court, such as those that
 involve the weighing of competing considerations." Public
 Serv. Co. v. Patch, No. 98-1764, 1998 WL 823177, at *5 (1st
 Cir. Dec. 3, 1998). As explained in Ocean Spray Cranberries,
 Inc. v. Pepsico, Inc., 160 F.3d 58 (1st Cir. 1998), "[t]he
 usual rubric refers to abuse of discretion . . . but this
 phrasing is most pertinent to issues of judgment and the
 balancing of conflicting factors; rulings on abstract legal
 issues remain reviewable de novo, and findings of fact are
 assessed for clear error." Id. at 61 n.1 (citations omitted). 
 If findings are made under incorrect standards, little or no
 deference is due those findings. Cf. Uno v. City of Holyoke,
 72 F.3d 973, 978 (1st Cir. 1995). Further, "[a]buse of
 discretion occurs . . . when a material factor deserving
 significant weight is ignored, when an improper factor is
 relied upon, or when all proper and no improper factors are
 assessed, but the court makes a serious mistake in weighing
 them." Foster v. Mydas Assocs., Inc., 943 F.2d 139, 143 (1st
 Cir. 1991) (internal quotation marks omitted).
 A party seeking a preliminary injunction must
 establish that 1) it is substantially likely to succeed on the
 merits of its claim; 2) absent the injunction there is "a
 significant risk of irreparable harm"; 3) the balance of
 hardships weighs in its favor; and 4) the injunction will not
 harm the public interest. TEC Eng'g Corp., 82 F.3d at 544
 (discussing a claim for trade dress infringement). In the
 trademark context, "irreparable harm may be shown even in the
 absence of actual injury to plaintiff's business based on
 plaintiff's demonstration of a likelihood of success on the
 merits on its claim." Calamari Fisheries, Inc. v. The Village
 Catch, Inc., 698 F. Supp. 994, 1013 (D. Mass. 1988) (citing
 Camel Hair & Cashmere Inst., 799 F.2d at 14). There is no
 argument that the district court applied the wrong test for
 injunctive relief; there is considerable dispute over the
 subsidiary tests which the court applied in determining whether
 there was probability of success on the various elements of the
 claims.
 II. Facts and Procedural History
 Lund, a Danish corporation, manufactures bathroom and
 kitchen fixtures and accessories, including faucets. Lund has
 been a family-owned corporation since its establishment in
 1873. In 1969, Lund introduced the VOLA faucet, designed by
 the noted architect Arne Jacobsen. The faucet, which has
 received numerous awards over the past quarter-century, is
 Lund's principal revenue-producing product. Lund has sold a
 total of more than 600,000 VOLA faucets. The faucet has been 
 regularly advertised and featured in numerous magazines. Kroin
 Incorporated is the sole United States distributor of the VOLA.
 Kohler is the largest supplier of plumbing fixtures
 in this country, selling hundreds of types of kitchen and
 bathroom fixtures. In 1994, Kohler contacted Lund regarding
 the possibility of selling the VOLA faucet under Kohler's name. 
 In 1995, Kohler purchased eight VOLA faucets from Lund for the
 purpose of testing the faucets to see if they fit in a sink
 that Kohler planned to introduce and to ensure that the faucets
 complied with United States regulations. Kohler claims that it
 tested the faucets and found that they did not meet U.S.
 regulations regarding water flow capacity and resistance to
 hydrostatic pressure, a contention Lund contests, and as to
 which there was conflicting evidence. 
 Kohler gave a VOLA faucet to Erich Slothower, an
 industrial designer employed by Kohler. Slothower then
 designed the Falling Water faucet, which Kohler introduced for
 sale at a price lower than that of the VOLA faucet. Slothower
 testified that he examined the VOLA carefully prior to
 designing the Falling Water, but that he attempted to make the
 Falling Water faucet different from the VOLA. Kohler's large
 size and well-established distribution channels mean that the
 Falling Water is likely to be more easily available, in
 addition to being less expensive.
 The district court found a number of similarities
 between the VOLA and the Falling Water faucets. Both are
 "single-control, wall-mounted faucets" with handles that
 "utilize a thin cylindrical lever to adjust water temperature
 and volume"; both have "spouts and aerator holders . . . of
 uniform diameter," with the spouts "bend[ing] downward at right
 angles softened by a curve"; and "both faucets offer spouts in
 almost exactly the same three lengths." Lund I, 11 F. Supp. 2d
 at 116. Both faucets fit no-hole sinks. In contrast, most
 sinks sold in the United States are "three-hole" sinks, with one
 hole each for the water spout and the hot and cold spigots. 
 However, the district court also found dissimilarities between
 the faucets, including differences in the faucets' handles, a
 rounded lever on the Falling Water faucet compared to a flat
 lever on the VOLA, and a rounded bonnet -- a piece that
 connects the faucet to the wall -- on the mounting end of the
 Falling Water spout, compared to no bonnet on the VOLA. Seeid. The court also found that the housemarks, "VOLA" and
 "Kohler," are clearly dissimilar and are prominently displayed
 on the faucets. See id. at 123.
 Co-defendant Robern, which Kohler acquired in August
 1995, also purchased a number of VOLA faucets. Before being
 acquired by Kohler, Robern purchased 218 VOLA faucets from
 Kroin for use in a sink module. Robern apparently promoted its
 sink module pictured with the VOLA faucets. At approximately
 the same time as Kohler acquired Robern, Kroin refused to sell
 additional VOLA faucets to Robern, claiming that Robern was
 selling the faucets to Kroin's customers at prices below those
 Kroin was charging. One year later, Robern announced plans to
 market its sink module with the Falling Water faucet. Lund
 produced evidence that Robern has continued to use pictures of
 the VOLA in promotional materials, despite the fact that it has
 replaced the VOLA with the Falling Water faucet in its sink
 modules.
 Kohler introduced the Falling Water faucet to the
 market in 1996. Lund filed suit on February 27, 1997, alleging
 trade dress infringement under Section 43(a) of the Lanham Act
 and trade dress dilution under the FTDA. Kohler denied any
 violations and argued that the FTDA was unconstitutional as
 applied to product designs. The district court held an
 evidentiary hearing on April 16 and 30, 1997. 
 The court ruled on the motion for a preliminary
 injunction in three stages. In a February 5, 1998 Memorandum
 and Order, the court found that Lund had demonstrated a
 substantial likelihood of success on its dilution claim, and so
 enjoined Kohler from selling its Falling Water faucet. SeeLund I, 11 F. Supp. 2d at 127. At the same time, the court
 found that Lund had failed to show likelihood of success on its
 claim of trade dress infringement, and it reserved decision on
 the question of the constitutionality of the FTDA pending
 additional briefing. See id. 
 On February 12, 1998, the district court stayed the
 preliminary injunction pending resolution of Kohler's claim
 that application of the FTDA to product designs violates the
 Patent Clause. 
 In an order dated March 31, 1998 and a memorandum
 dated April 2, 1998, the district court found that Kohler's
 constitutional argument was unlikely to succeed on the merits,
 lifted the stay on the injunction, and ordered Lund to post a
 bond of $250,000. See I.P. Lund Trading ApS v. Kohler Co., 11
 F. Supp. 2d 127, 134-35 (D. Mass. 1998) ("Lund II").
 The district court also denied Kohler's request to
 stay the injunction pending appeal to this court. On April 29,
 1998, this court rejected Kohler's request for a stay pending
 appeal.
 III. Purposes of Trademark and Trade Dress Protection
 The basic building blocks of the analysis are worth
 reiterating. Section 43(a) of the Lanham Act provides
 protection against the use of "any word, term, name, symbol, or
 device" that "is likely to cause confusion, or to cause mistake,
 or to deceive" as to the source of a product. 15 U.S.C. 
 1125(a). Trade dress includes "the design and appearance of [a]
 product together with the elements making up the overall image
 that serves to identify the product presented to the consumer." 
 Chrysler Corp. v. Silva, 118 F.3d 56, 58 (1st Cir. 1997)
 (alteration in original) (quoting Fun-Damental Too, Ltd. v.
 Gemmy Indus. Corp., 111 F.3d 993, 999 (2d Cir. 1997)) (internal
 quotation marks omitted). The new law, the FTDA, Lanham Act
 section 43(c), grants protection to "famous" marks against any
 use of the mark that "causes dilution of the distinctive quality
 of the mark." 15 U.S.C. 1125(c). 
 To resolve the issues presented, we go back to the
 underlying purposes of trademark and trade dress infringement
 and dilution protections. The various intellectual property
 protection mechanisms serve related but distinct ends. These
 distinct ends inform the selection of appropriate tests under
 the different sections of the Lanham Act. These distinctions
 are also particularly pertinent to Kohler's constitutional
 claim that dilution protection of trade dress of product design
 amounts to an unconstitutional perpetual monopoly under the
 Patent Clause of the Constitution. The Patent Clause itself
 describes the "exclusive Right" given as being for "limited
 Times." U.S. Const. art. I, 8, cl. 8. "The laws of patents,
 copyright, trade secrets, trademarks, unfair competition, and
 misappropriation balance the conflicting interests in
 protection and dissemination differently in different contexts
 through specific rules that determine just who will receive
 protection, of just what kind, under what circumstances, and
 for how long." DeCosta v. Viacom Int'l, Inc., 981 F.2d 602, 605
 (1st Cir. 1992). 
 A primary purpose of trade dress or trademark
 protection is to protect that which identifies a product's
 source. See Qualitex Co. v. Jacobson Prods. Co., 514 U.S. 159,
 162 (1995) (noting that "the statutory definition of a trademark
 . . . requires that a person 'us[e]' or 'inten[d] to use' the
 mark 'to identify and distinguish his or her goods, including
 a unique product, from those manufactured or sold by others and
 to indicate the source of the goods, even if that source is
 unknown'" (alterations in original) (quoting 15 U.S.C. 1127)). 
 "The purpose of trademark laws is to prevent the use of the same
 or similar marks in a way that confuses the public about the
 actual source of the goods or service." Star Fin. Servs., Inc.v. Aastar Mortgage Corp., 89 F.3d 5, 9 (1st Cir. 1996). 
 Traditional trademark and trade dress law thus encourages
 production of products of high quality "and simultaneously
 discourages those who hope to sell inferior products by
 capitalizing on a consumer's inability quickly to evaluate the
 quality of an item offered for sale." Qualitex, 514 U.S. at
 164. More importantly for our purposes, trademark and trade
 dress protection serves to protect both the trademark or trade
 dress owner and the public by avoiding confusion or mistake. 
 In contrast, dilution statutes, and the FTDA in
 particular, protect only the trademark or trade dress owner and
 are not concerned with possible confusion on the part of
 consumers. See J. Gilson, Trademark Protection and Practice 5.12 (1998). Any protection of the public intended by the
 FTDA is indirect at best. "Anti-dilution statutes have
 developed to fill a void left by the failure of trademark
 infringement law to curb the unauthorized use of marks where
 there is no likelihood of confusion between the original use
 and the infringing use." L.L. Bean, Inc. v. Drake Publishers,
 Inc., 811 F.2d 26, 30 (1st Cir. 1987). Filling this void,
 Congress passed the FTDA in 1995 both to provide uniform
 national protection against dilution and to bring this
 country's law into conformity with international agreements. 
 See H.R. Rep. No. 104-374, at 3-4 (1995), reprinted in 1995
 U.S.C.C.A.N 1029, 1030-31. 
 IV. Prerequisites for Protection from Infringement and
 Dilution
 Despite different purposes being served, claims for
 protection against trademark and trade dress infringement, on
 the one hand, and dilution, on the other, share three common
 elements before the analyses diverge. Those elements are that
 marks (a) must be used in commerce, (b) must be non-functional,
 and (c) must be distinctive. While all such marks may be
 protected against infringement, under the FTDA only famous and
 distinctive marks are eligible for protection against dilution. 
 No requirement for fame is present in trademark and trade dress
 infringement.
 A. Use in Commerce
 There is no dispute that both Lund's and Kohler's
 faucets have been used in commerce, thus satisfying the first
 requirement for protection against both infringement and
 dilution. See 15 U.S.C. 1125(a),(c).
 B. Functionality
 1. Legal Standards
 To be protected under the Lanham Act, a trademark or
 trade dress must not be functional. See Two Pesos, Inc. v.
 Taco Cabana, Inc., 505 U.S. 763, 775 (1992). If the trade
 dress is functional, it receives no protection under trademark
 law. The functionality doctrine has considerable economic and
 legal significance. "The functionality doctrine prevents
 trademark law, which seeks to promote competition by protecting
 a firm's reputation, from instead inhibiting legitimate
 competition by allowing a producer to control a useful product
 feature." Qualitex, 514 U.S. at 164. Thus, the functionality
 doctrine marks the boundaries of trade dress protection. 
 As discussed later, "if functional features were
 given trademark or trade dress protection, such protection
 would clearly clash with the objectives of federal functional
 patent law." 1 J. McCarthy, McCarthy on Trademarks and Unfair
 Competition 7:64 (4th ed. 1996). The rule against functional
 features being protected as symbols of origin "is obviously to
 prevent the grant of perpetual monopoly by the issuance of a
 trade-mark in the situation where a patent has either expired,
 or . . . cannot be granted." Sylvania Elec. Prods., Inc. v.Dura Elec. Lamp Co., 247 F.2d 730, 732 (3d Cir. 1957).
 The core inquiry into whether trade dress is
 functional requires examination of the effects that granting
 protection to a product will have on the ability of others to
 compete. Thus, in Inwood Laboratories, Inc. v. Ives
 Laboratories, Inc., 456 U.S. 844 (1982), the Court stated that
 a functional product feature is one that "is essential to the
 use or purpose of the article or [that] . . . affects the cost
 or quality of the article." Id. at 851 n.10. In Qualitex, the
 Court added that the inquiry into functionality turns in part
 on whether granting protection to a mark "would permit one
 competitor . . . to interfere with legitimate (nontrademark-
 related) competition through actual or potential exclusive use
 of an important product ingredient." Qualitex, 514 U.S. at
 170. 
 The fact that a product contains some functional
 elements does not, however, preclude Lanham Act protection. 
 "[A] particular arbitrary combination of functional features,
 the combination of which is not itself functional, properly
 enjoys protection." Taco Cabana Int'l, Inc. v. Two Pesos, Inc.,
 932 F.2d 1113, 1119 (5th Cir. 1991), aff'd, 505 U.S. 763
 (1992). The crucial inquiry is into the effect that granting
 protection will have on the opportunity of others to compete. 
 As the parties note, this court has not previously
 decided whether a showing of non-functionality is an element of
 the claim of the party seeking protection, or whether
 functionality is an affirmative defense on which the defending
 party has the burden. See TEC Eng'g Corp., 82 F.3d at 546 n.3. 
 In Fisher Stoves, Inc. v. All Nighter Stove Works, Inc., 626
 F.2d 193 (1st Cir. 1980), this court, although not resolving
 the issue, stated that it was "not at all clear" that the
 district court erred when it placed the burden of proof on the
 plaintiff. Id. at 195. Other circuit courts which have
 decided the issue are split. Compare Sunbeam Prods., Inc. v.
 West Bend Co., 123 F.3d 246, 251 (5th Cir. 1997) (holding that
 plaintiffs bear the burden), cert. denied, 118 S. Ct. 1795
 (1998), Woodsmith Publ'g Co. v. Meredith Corp., 904 F.2d 1244,
 1247 (8th Cir. 1990), Rachel v. Banana Republic, Inc., 831 F.2d
 1503, 1506 (9th Cir. 1987), Ambrit, Inc. v. Kraft, Inc., 812
 F.2d 1531, 1535 (11th Cir. 1986), Kwik-Site Corp. v. Clear View
 Mfg. Co., 758 F.2d 167, 178 (6th Cir. 1985), and CIBA-GEIGY
 Corp. v. Bolar Pharm. Co., 747 F.2d 844, 854 (3d Cir. 1984),
 with Computer Care v. Service Sys. Enters., Inc., 982 F.2d
 1063, 1068 (7th Cir. 1992) (holding that defendants bear the
 burden), Brunswick Corp. v. Spinit Reel Co., 832 F.2d 513, 520
 (10th Cir. 1987), and LeSportsac, Inc. v. K Mart Corp., 754
 F.2d 71, 75-76 (2d Cir. 1985). See generally 1 McCarthy
 7:72. The Lanham Act itself provides no guidance on the
 issue, and the caselaw contains little discussion of the
 rationale for allocating the burden of proof to plaintiffs or
 defendants. 
 We hold that the party alleging trademark
 infringement and dilution bears the burden of proving non-
 functionality of those elements of the physical object that the
 plaintiff claims constitute the mark and for which the
 plaintiff is seeking protection. Several rationales support
 the burden being placed on those seeking protection, here the
 plaintiff. Functionality, or, more precisely, a showing of
 non-functionality of the elements for which protection is
 sought, is an essential component of the protection the law
 gives to trademarks and trade dress. A showing of non-
 functionality is essential because the doctrine prevents
 trademarks from limiting legitimate competition. Put
 differently, "functionality" plays an important role in
 preventing a constitutional problem between the Lanham Act and
 patent law. Moreover, Congress did not intend to provide
 Lanham Act protection to functional aspects of products, seeTwo Pesos, 505 U.S. at 775, and thus it would be anomalous if
 the burden were not placed on the party seeking protection. 
 Such an assignment of the burden of proof ensures that
 trademarks serve their intended purpose of identifying product
 sources. 
 A plaintiff's product is known best by plaintiff
 itself. A contrary result, placing the burden on defendant,
 could lead to untoward results. It could also lead to
 unwarranted litigation. If protected elements of a product are
 indeed functional, and the burden of showing non-functionality
 is placed on plaintiff, plaintiff will have incentives not to
 bring unwarranted actions hoping that defendants will fail to
 raise or prove functionality as an affirmative defense. It
 would be far easier for plaintiffs to obtain protection for
 functional aspects of their products -- and thus limit
 legitimate competition -- if defendants were to bear the burden
 of proof, as defendants might lack the ability or incentive to
 pursue the issue fully. There is value in minimizing the
 chances of the issue not being properly raised or presented.
 2. Application of Functionality Doctrine
 The district court did not make a specific finding on
 functionality and the record on the important issue of
 functionality is unclear. Although Lund I commented that "[n]o
 one argues that the VOLA design is 'functional,' as that term
 is used in trademark law," Lund I, 11 F. Supp. 2d at 120 n.12,
 Kohler did in fact argue in a filing that "to the extent that
 some features on the respective faucets may somewhat resemble
 each other, these features are either functional in nature and
 thus not protectable under the Lanham Act or so commonly used
 in the plumbing industry that they are obvious -- not
 distinctive of a particular product" (emphasis added). Thus
 Kohler did not waive the issue. We cannot say that it is
 obvious no aspect of the VOLA is functional; indeed some
 aspects give the appearance of being functional and so the
 issue is a real one. There are significant dissimilarities
 between the two faucets, and at least some of the similarities
 that do exist are suggestive of functionality. Nonetheless, we
 will assume at this stage of the case that there is some non-
 functional residuum based on the aesthetic unity and
 proportions of the VOLA.
 The issue of functionality plays a key role in this
 case. In the absence of a finding of non-functionality of the
 aspects of the VOLA for which protection is sought, and in
 light of our placing the burden of proof on plaintiff, there
 can be no trademark or trade dress protection. If the VOLA
 design or aspects of it are functional, then the only source of
 exclusive rights would be in a utility patent. Trademark and
 trade dress law cannot be used to evade the requirements of
 utility patents, nor the limits on monopolies imposed by the
 Patent Clause. This also means that in the absence of a
 finding of non-functionality, no protection is available under
 the FTDA and no injunction may issue under the FTDA, a point to
 which we return later.
 But there is another reason that the functionality
 analysis must be undertaken. There is a relationship between
 functionality and distinctiveness:
 If a feature is functional, it is likely that all
 similar articles will have a similar functional
 feature, and one seller's feature is not likely to
 evoke any response in buyers that it is unique or is
 a distinctive symbol of origin.
 
 1 McCarthy 7:64. It is also clear that even if a functional
 feature has achieved secondary meaning as an indication of
 origin, that feature is not protectable under trademark or
 trade dress law. See Fisher Stoves, 626 F.2d at 195-96; 1
 McCarthy 7:66.
 C. Distinctiveness
 The third prerequisite for protection is
 distinctiveness. In order to receive trade dress protection,
 a product must either be inherently distinctive or have
 acquired secondary meaning. See Two Pesos, 505 U.S. at 769;
 TEC Eng'g Corp., 82 F.3d at 545. The inquiry into
 distinctiveness turns on the total appearance of the product,
 not on individual elements. Cf. Sunbeam, 123 F.3d at 251
 (stating that "'trade dress' refers to the total image and
 overall appearance of a product"). The district court found,
 within the usual preliminary injunction standards about
 likelihood of success, that the VOLA faucet was not inherently
 distinctive but that it had acquired secondary meaning.
 1. Inherently Distinctive Marks
 In analyzing whether a product's mark is distinctive,
 courts have often divided marks into the five categories set
 forth in Abercrombie & Fitch Co. v. Hunting World, Inc., 537
 F.2d 4 (2d Cir. 1976): 1) generic, 2) descriptive, 3)
 suggestive, 4) arbitrary, and 5) fanciful. See Two Pesos, 505
 U.S. at 768 (discussing Abercrombie); Abercrombie, 537 F.2d at
 9. Suggestive, arbitrary, and fanciful marks are deemed
 inherently distinctive; descriptive marks receive protection
 only upon a showing that they have acquired secondary meaning;
 and generic marks are not protectable. Abercrombie itself
 addressed words, the usual form of mark. The Abercrombie test
 has been used in some other areas of trade dress, such as
 product packaging and the overall appearance of a restaurant. 
 See Two Pesos, 505 U.S. at 768-69, 773. 
 Courts have struggled with whether the Abercrombietest, originally designed for words, should be imported
 wholesale into that specialized area of trade dress claimed to
 come from product design. Although the Supreme Court in Two
 Pesos endorsed the Abercrombie test in the context of non-
 verbal trade dress not involving product designs, at least two
 circuits have been skeptical of the appropriateness of the test
 in the product design context. See Knitwaves, Inc. v.
 Lollytogs Ltd., 71 F.3d 996, 1007-08 (2d Cir. 1995); Duraco
 Prods., Inc. v. Joy Plastic Enters., Ltd., 40 F.3d 1431, 1445-
 49 (3d Cir. 1994); 1 McCarthy 8:12. Indeed, these courts,
 questioning whether a product design can ever be inherently
 distinctive, apply a more rigorous standard for determining
 inherent distinctiveness of product designs than they do for
 determining the inherent distinctiveness of more traditional
 forms of trade dress. See Knitwaves, 71 F.3d at 1008-09
 (requiring that a product design serve primarily to indicate a
 product's source); Duraco Prods., 40 F.3d at 1449 (requiring
 product designs to be "(i) unusual and memorable; (ii)
 conceptually separable from the product; and (iii) likely to
 serve primarily as a designator of origin of the product"). The
 problem with applying traditional trademark or trade dress
 classifications to product designs arises because "one cannot
 automatically conclude from a product feature or configuration
 -- as one can from a product's arbitrary name . . . -- that, to
 a consumer, it functions primarily to denote the product's
 source." Duraco Prods., 40 F.3d at 1441. 
 Parting from the skeptics, the Eighth Circuit has
 rejected any differentiation between product designs and other
 forms of trade dress. See Stuart Hall Co. v. Ampad Corp., 51
 F.3d 780, 787-88 (8th Cir. 1995). The Stuart Hall court argued
 that the Second and Third Circuit tests would effectively
 eliminate the possibility that a product design could be
 inherently distinctive, collapsing the inherent distinctiveness
 inquiry into the secondary meaning inquiry. See id. at 787
 ("The requirement of source-identification applies not to
 whether a trade dress is inherently distinctive, but to whether
 it has a secondary meaning."). Such an outcome would directly
 contradict the Supreme Court's holding in Two Pesos that
 inherently distinctive trade dress is protectable even absent
 a showing of secondary meaning. See id. at 788 (citing Two
 Pesos, 505 U.S. at 769-70).
 The district court here applied the Second Circuit's
 Knitwaves test. It examined whether the VOLA's design was
 "likely to serve primarily as a designator of origin of the
 product." Lund I, 11 F. Supp. 2d at 120 (quoting Knitwaves, 71
 F.3d at 1008) (internal quotation marks omitted). Like the
 court in Knitwaves, the district court did so by looking to
 whether the VOLA's creators intended the design to serve as a
 source indicator. See id.; see also Knitwaves, 71 F.3d at 1009
 ("As Knitwaves' objective in the two sweater designs was
 primarily aesthetic, the designs were not primarily intended as
 source identification. Those sweater designs therefore fail to
 qualify for protection of trade dress inherent in product
 design."). The court found that the VOLA's design was "not
 'primarily' intended as source identification" because "Lund's
 design objective was 'primarily aesthetic,'" and thus "the
 design of the VOLA faucet cannot be considered inherently
 distinctive." Id. 
 Lund argues that the district court was in error
 because it was obligated by Supreme Court precedent to apply
 the Abercrombie test. Lund argues that application of the
 wrong test produced the wrong result. Lund points to other
 decisions in the District of Massachusetts which have rejected
 the Knitwaves and Duraco Products tests and adopted the
 Abercrombie analysis in the product design context. See Big
 Top USA, Inc. v. Wittern Group, 998 F. Supp. 30, 46-47 (D.
 Mass. 1998); Lainer v. Bandwagon, Inc., 983 F. Supp. 292, 300
 (D. Mass. 1997). 
 We do not believe that the Supreme Court's
 endorsement of the Abercrombie test in Two Pesos requires a
 strict application of the Abercrombie test in all contexts,
 particularly where product design is involved. The Supreme
 Court stated only that "[m]arks are often classified in" the
 five Abercrombie categories. Two Pesos, 505 U.S. at 768. The
 Court did not mandate the application of the Abercrombie test;
 rather, it affirmed the use of the Abercrombie factors in the
 case before it. See id. at 768-69. The holding of Two Pesoswas that plaintiffs seeking protection for inherently
 distinctive trade dress are not required to demonstrate
 secondary meaning. See id. at 770. Unless the Court decides
 to carve out an exception to this rule for claims about product
 design, which we deem unlikely, then the holding must be
 honored. And so we agree with the Eighth Circuit that the test
 for inherent distinctiveness should not be altered to the
 degree that it eviscerates the distinction between inherently
 distinctive trade dress and trade dress that has acquired
 secondary meaning. We do not believe, however, that analysis
 of the problem using different factors than the Abercrombiefactors results in such an outcome.
 This court has previously relied on the test set
 forth in Seabrook Foods, Inc. v. Bar-Well Foods Ltd., 568 F.2d
 1342 (C.C.P.A. 1977), to determine whether a product design is
 inherently distinctive, and we do so again. In Wiley v.
 American Greetings Corp., 762 F.2d 139 (1st Cir. 1985), this
 court stated that inherent distinctiveness of a product design
 should be determined by reference to 
 whether [the design] was a "common" basic shape or
 design, whether it was unique or unusual in a
 particular field, whether it was a mere refinement of
 a commonly-adopted and well-known form of
 ornamentation for a particular class of goods viewed
 by the public as dress or ornamentation for the
 goods, or whether it was capable of creating a
 commercial impression distinct from the accompanying
 words.
 
 Id. at 141 (alteration in original) (quoting Seabrook Foods,
 568 F.2d at 1344) (internal quotation marks omitted). We also
 agree with one commentator's analysis that "[i]n reality, all
 three [Seabrook Foods] questions are merely different ways to
 ask whether the design, shape or combination of elements is so
 unique, unusual or unexpected in this market that one can
 assume without proof that it will automatically be perceived by
 customers as an indicator of origin -- a trademark." 1 McCarthy
 8:13. Although the plaintiff in Wiley brought suit under
 state common law, we find the test equally applicable to claims
 brought under the Lanham Act. 
 The Seabrook Foods test is largely consistent with
 the Second Circuit's Knitwaves test for inherent
 distinctiveness, that is, whether the design "is likely to serve
 primarily as a designator of origin of the product." Knitwaves,
 71 F.3d at 1008 (quoting Duraco Prods., 40 F.3d at 1449)
 (internal quotation marks omitted); see also Landscape Forms,
 Inc. v. Columbia Cascade Co., 113 F.3d 373, 378 n.3 (2d Cir.
 1997) (rejecting an argument that the Knitwaves and Seabrook
 Foods tests are inconsistent).
 In contrast to the Second Circuit, however, we
 believe that Two Pesos obliges courts to maintain a clear
 distinction between the inquiry into secondary meaning and the
 inquiry into inherent distinctiveness. Cf. Knitwaves, 71 F.3d
 at 1008. Although plaintiffs seeking to demonstrate that a
 product design is inherently distinctive may find that their
 task is a difficult one, Two Pesos makes clear that this
 opportunity remains open. Product designs are unlike many more
 traditional subjects of trademark protection, "which almost
 automatically tell a customer that they refer to a brand,"
 Qualitex, 514 U.S. at 162-63, and it is therefore unlikely that
 many product designs will be found to be inherently
 distinctive. Nevertheless, plaintiffs seeking trade dress
 protection for product designs are entitled to attempt to show
 that their designs are so unique as to be primarily perceived
 as indicating the product's origin. Cf. 2 McCarthy 15:9 ("A
 design or shape, or a trade dress that is so fanciful as to be
 inherently distinctive can function as a mark without the need
 for proof of secondary meaning. The issue is whether this
 shape is so different or unusual for this type of goods or
 services that its distinctiveness can be assumed.").
 Applying Knitwaves, the district court did make a
 finding as to inherent distinctiveness. It found that the
 VOLA's design is not "likely to serve primarily as a designator
 of origin of the product." On this record that finding cannot
 be said to be clearly erroneous. One aspect of the test
 applied in reaching this conclusion is, nonetheless,
 problematic. The district court relied on evidence as to
 Lund's intent. But the plaintiff's intent is not entitled to
 much weight in a determination of whether a product design is
 inherently distinctive. See 1 McCarthy 8.13 (stating that
 "the intent of the designer is a very weak indicator of the
 likely reaction of potential customers"); cf. Landscape Forms,
 113 F.3d at 377 n.3 ("If Knitwaves forced courts to decide
 whether a manufacturer's purpose was to create either something
 of beauty or something indicative of source, we agree the task
 would often prove impossible."). The district court may,
 however, have given little weight to this factor in reaching
 its conclusion. 
 The district court used the Knitwaves test, which is
 consistent with this Circuit's Wiley/Seabrook test, to reach
 its conclusion. There is adequate evidence in the record to
 support the district court's determination there was little
 probability of success in demonstrating that the VOLA's design
 inherently and primarily serves to identify the faucet's
 source.
 2. Secondary Meaning
 The second method for demonstrating that a product's
 trademark or trade dress is distinctive and thus protectable is
 through a showing that the mark has acquired secondary meaning. 
 "To establish secondary meaning, a manufacturer must show that,
 in the minds of the public, the primary significance of a
 product feature or term is to identify the source of the
 product rather than the product itself." Inwood Lab., 456 U.S.
 at 851 n.11. 
 While some have suggested that the primary
 significance test is too stringent, particularly for product
 design cases, we reject any lesser test. The Supreme Court has
 consistently used "primary significance." As the Court said in
 a case concerning a product design (the shape of a shredded
 wheat cereal biscuit), secondary meaning occurs when "the
 primary significance . . . in the minds of the consuming public
 is not the product but the producer." Kellogg Co. v. National
 Biscuit Co., 305 U.S. 111, 118 (1938). Where protection of the
 product design itself is at issue, there is every reason to
 hold to the usual stringent primary significance test in order
 to minimize constitutional concerns.
 Secondary meaning may be "established in a number of
 ways," and courts may weigh a number of factors, including the
 length or exclusivity of use of a mark, "the size or prominence
 of [plaintiff's] enterprise," and the existence of substantial
 advertising by plaintiff. President & Trustees of Colby
 College v. Colby College-New Hampshire, 508 F.2d 804, 807-08
 (1st Cir. 1975). Other factors include the product's
 "[e]stablished place in the market" and "[p]roof of intentional
 copying." 2 McCarthy 15:30; see also Boston Beer Co. Ltd.
 Partnership v. Slesar Bros. Brewing Co., 9 F.3d 175, 182 (1st
 Cir. 1993) (listing factors). Secondary meaning may be
 determined with reference to a particular trade or "branch of
 the purchasing public." See Colby College, 508 F.2d at 808
 (quoting G. & C. Merriam Co. v. Saalfield, 198 F. 369, 373 (6th
 Cir. 1912)) (internal quotation marks omitted). 
 The district court found that Lund had a likelihood
 of success of showing that the VOLA had achieved secondary
 meaning, noting that "there is sufficient evidence in the record
 . . . to conclude that purchasers of high-end bathroom
 fixtures, including interior designers, now know the VOLA by
 sight." Lund I, 11 F. Supp. 2d at 121. The district court also
 found that "[e]nough money and effort has been invested in
 promoting the VOLA's design that it is recognizable as coming
 from a unique source, albeit through a variety of distributors,"
 and that "the primary significance of the VOLA design, to the
 relevant public, is as a high-end product, coming from Lund." 
 Id.
 Kohler challenges the district court's determination
 that the VOLA has most likely acquired secondary meaning. We
 review the district court's findings of fact for clear error.
 The district court's conclusion is doubtful for
 several reasons. First, as noted, there was no analysis of
 functionality and there is a relationship between functionality
 and secondary meaning.
 Second, the context suggests otherwise -- the
 district court found, under separate but related doctrines,
 that the faucets were mostly dissimilar. Cf. 2 McCarthy
 15:38 (stating that copying may give rise to an inference of
 secondary meaning). The court found that there was no customer
 confusion. It is in this barren context that the claim is made
 that something in the design which is not functional serves
 primarily to signify the source of the faucet and not primarily
 to signify that it is an aesthetically pleasing faucet.
 Third, little is present of the evidence
 traditionally relied on (but which admittedly is not a sine qua
 non) for a finding of secondary meaning. The secondary meaning
 analysis is primarily a subjective one, looking into the minds
 of potential customers. Customer survey evidence, while not
 required, is a valuable method of showing secondary meaning.
 See Boston Athletic Ass'n v. Sullivan, 867 F.2d 22, 32 n.9 (1st
 Cir. 1989); Colby College, 508 F.2d at 809. As the district
 court correctly noted, the purported survey evidence was
 unreliable. The expert testimony, which involved one expert
 testifying for each side, was contradictory.
 Fourth, the VOLA has been sold by a number of
 different companies in this country and has not been advertised
 here as coming from Lund. This situation is akin to the use of
 different marks to identify a single product. "When a product
 . . . design is sold by the authority of plaintiff under
 several different word marks . . ., it is more difficult for
 plaintiff to prove acquisition of secondary meaning - that is,
 that the shape or design identifies a single source." 1
 McCarthy 8:14 (emphasis in original).
 Finally, while such testimony is entitled to little
 weight because the focus is on the understanding of prospective
 purchasers, the testimony is that Lund did not intend in
 designing the product that the design signify source.
 It is true that the VOLA product has been much
 advertised or featured, but at times without any source
 attribution or with attribution to different sources.
 Lund relies heavily on the testimony of Corbin, a
 retailer presented as Lund's expert. Corbin stated that the
 VOLA was "perceived as a high-end product, a very simple and
 elegant product; one that is generally known by name as either
 a Kroin faucet or Jacobsen faucet; . . . a design icon . . . ." 
 But to say it is a design success is not to say that the
 primary significance of the design is to signify its source.
 In the end we need not resolve the point. Lund lost
 on the infringement preliminary injunction and for other
 reasons, even if Lund had shown secondary meaning, it has not
 shown itself entitled to relief under the FTDA.
 V. Infringement
 Establishing trademark infringement requires a
 showing that prospective buyers of the product in question --
 here, high-end faucets -- are likely to be confused as to the
 product's source. See 15 U.S.C. 1125(a); Two Pesos, 505 U.S.
 at 769; TEC Eng'g Corp., 82 F.3d at 545; Purolator, Inc. v.
 EFRA Distribs., Inc., 687 F.2d 554, 559 (1st Cir. 1982); cf.International Ass'n of Machinists & Aerospace Workers v.
 Winship Green Nursing Ctr., 103 F.3d 196, 201 (1st Cir. 1996)
 ("[T]he law has long demanded a showing that the allegedly
 infringing conduct carries with it a likelihood of confounding
 an appreciable number of reasonably prudent purchasers
 exercising ordinary care."). Establishing infringement also
 requires a showing that the plaintiff uses, and thus owns, the
 mark in question, and that the defendant's mark is similar to
 or the same as the plaintiff's mark. See DeCosta, 981 F.2d at
 605. A plaintiff is not entitled to a preliminary injunction
 on a trademark infringement claim unless it can persuade the
 district court that it is likely to be able to demonstrate
 consumer confusion. See WCVB-TV v. Boston Athletic Ass'n, 926
 F.2d 42, 44 (1st Cir. 1991). 
 This court has identified eight factors to be weighed
 in determining likelihood of confusion:
 (1) the similarity of the marks; (2) the similarity
 of the goods; (3) the relationship between the
 parties' channels of trade; (4) the relationship
 between the parties' advertising; (5) the classes of
 prospective purchasers; (6) evidence of actual
 confusion; (7) the defendant's intent in adopting its
 mark; and (8) the strength of the plaintiff's mark. 
 . . . No one factor is necessarily determinative,
 but each must be considered.
 
 Boston Athletic Ass'n, 867 F.2d at 29 (quoting Volkswagenwerk
 Aktiengesellschaft v. Wheeler, 814 F.2d 812, 817 (1st Cir.
 1987)) (citations and internal quotation marks omitted). The
 factors are non-exclusive, however, and are not always apt to
 the particular facts of a case. See Winship Green, 103 F.3d at
 201. In addition, the first factor, similarity, "is determined
 on the basis of the total effect of the designation, rather
 than a comparison of individual features." Pignons S.A. de
 Mecanique de Precision v. Polaroid Corp., 657 F.2d 482, 487
 (1st Cir. 1981) (internal quotation marks omitted). 
 The district court applied these eight factors and
 determined that, taken together, the factors weighed against a
 finding of a likelihood of consumer confusion. The court found
 that the strength of the VOLA's mark and the similarity of the
 VOLA and the Falling Water products were factors that favored
 the plaintiffs, but that the class of prospective purchasers,
 the channels of trade, the defendant's intent, and the
 dissimilarity of the VOLA and Falling Water marks all favored
 the defendants. The court found that the two remaining factors
 did not weigh in favor of either party.
 Lund argues that the district court misapplied the
 eight factors listed above, saying the court committed four
 errors. First, Lund argues that the district court accorded
 consumer sophistication excessive weight, particularly in
 reaching its determination that the channels of trade and the
 classes of prospective consumers made confusion less likely. 
 Second, Lund argues that the court erred in its determination
 that the dissimilarity of the marks weighed against a finding
 of consumer confusion. Third, Lund argues that the district
 court erred when it found that Kohler's intention not to copy
 the VOLA weighed against a finding of consumer confusion. 
 Fourth, Lund argues that the district court ignored evidence of
 actual consumer confusion.
 Review of factual determinations is for clear error. 
 We have carefully considered each of Lund's arguments, and are
 unpersuaded that the district court's determination as to the
 probability of success on each of these points was erroneous. 
 However, we clarify two matters.
 First, little weight should be given to the
 determination that Kohler did not intend to copy the VOLA. In
 Chrysler, this court commented that "[s]trictly, intent, or lack
 thereof, does not affect the eyes of the viewer." Chrysler, 118
 F.3d at 59 n.3. We added that "[p]roof of bad intent may,
 psychologically, hurt as an admission," but "[p]roof of good
 intent does not change appearance." Id. Similarly, in Star
 Financial Services we commented that "a finding of good faith
 is no answer if likelihood of confusion is otherwise
 established." Star Fin. Servs., 89 F.3d at 11 (quoting Colby
 College, 508 F.2d at 811-12) (internal quotation marks
 omitted). Thus a finding of no intent to copy may not outweigh
 other factors that suggest a likelihood of confusion. 
 Second, the district court's discussion of post-sale
 confusion was based on an erroneous premise. In finding that
 post-sale confusion was unlikely, the court commented that
 "there is little or no chance that [the faucets] will be resold
 to unwary consumers." Lund I, 11 F. Supp. 2d at 123. Post-sale
 confusion refers not to the resale of the original product,
 however, but to the risk that non-purchasers, who themselves
 may be future consumers, will be deceived. See 3 McCarthy 
 23:7 (noting that "[t]he damage to the senior user . . . is that
 consumers could acquire the prestige value of the senior user's
 product by buying the copier's cheap imitation," and that in
 such a case, "[e]ven though the knowledgeable buyer knew that
 it was getting an imitation, viewers would be confused"). For
 example, in a case involving counterfeit Rolex watches, the
 court commented that
 [i]ndividuals examining the counterfeits, believing
 them to be genuine Rolex watches, might find
 themselves unimpressed with the quality of the item
 and consequently be inhibited from purchasing the
 real time piece. Others who see the watches bearing
 the Rolex trademarks on so many wrists might find
 themselves discouraged from acquiring a genuine
 because the items have become too common place and no
 longer possess the prestige once associated with
 them.
 
 Rolex Watch U.S.A., Inc. v. Canner, 645 F. Supp. 484, 495 (S.D.
 Fla. 1986). In other words, even if the purchaser of a Falling
 Water faucet knew that she was buying the Kohler faucet and not
 the VOLA, the district court could still find a likelihood of
 confusion if subsequent viewers of the faucet would believe it
 to be a VOLA. Cf. Keds Corp. v. Renee Int'l Trading Corp., 888
 F.2d 215, 222 (1st Cir. 1989) (noting that "point of sale
 confusion was not the only issue" because "prospective
 consumers, viewing the clothes on other people, would be
 confused as to the origin of the goods"). However, because the
 district court's determination of no likelihood of post-sale
 confusion does not appear to have been a key factor in its
 decision, we do not believe it undercuts the court's conclusion
 regarding probability of success on the merits. 
 The district court correctly found that Lund was
 unlikely to prevail on the merits of its infringement claim,
 and so correctly denied the preliminary injunction on those
 grounds.
 VI. Dilution
 Lund obtained the preliminary injunction against
 Kohler's distribution and promotion of the Falling Water faucet
 based on the district court's finding of likelihood of success
 under the new federal anti-dilution statute, the FTDA, which
 became effective in 1996. The injunction rested on the
 conclusion that Lund had established a likelihood of success of
 showing two essential elements. The first is that the "mark,"
 that is, the VOLA product design as an identifying mark, was
 "famous." The second is that Kohler's Falling Water faucet
 "diluted" Lund's mark. Both the terms "famous" and "dilution"
 are terms of art given specific rigorous meanings by the FTDA.
 We start with the language of the Act. The FTDA
 provides:
 The owner of a famous mark shall be entitled, subject
 to the principles of equity and upon such terms as
 the court deems reasonable, to an injunction against
 another person's commercial use in commerce of a mark
 or trade name, if such use begins after the mark has
 become famous and causes dilution of the distinctive
 quality of the mark, and to obtain such other relief
 as is provided in this subsection.
 
 15 U.S.C. 1125(c)(1).
 The FTDA created a new "federal cause of action to
 protect famous marks from unauthorized users that attempt to
 trade upon the goodwill and established renown of such marks
 and, thereby, dilute their distinctive quality." H.R. Rep. No.
 104-374, at 3, reprinted in 1995 U.S.C.C.A.N at 1030. Congress
 acted against a "patch-quilt system" of state law protection in
 which approximately twenty-five states had laws prohibiting
 trademark dilution. Id. While creating a federal cause of
 action, Congress expressly did not preempt state law, but
 attempted to create uniformity through the availability of a
 federal cause of action. A second consideration -- protection
 of famous marks of U.S. companies abroad -- also motivated
 Congress. See id. at 4, reprinted in 1995 U.S.C.C.A.N at 1031. 
 Enactment of the FTDA was consistent with agreements which were
 part of the Uruguay Round of the General Agreement on Tariffs
 and Trade (specifically, the Agreement on Trade-Related Aspects
 of Intellectual Property Rights, including Trade in Counterfeit
 Goods ("TRIPS")) and the Paris Convention. Enactment of the law
 was also thought to be of value to the U.S. in bilateral and
 multi-lateral trade negotiations. See id.
 Sponsors of the bill articulated the type of problem
 the Act was meant to solve:
 [T]his bill is designed to protect famous trademarks
 from subsequent uses that blur the distinctiveness of
 the mark or tarnish or disparage it, even in the
 absence of a likelihood of confusion. Thus, for
 example, the use of DuPont shoes, Buick aspirin, and
 Kodak pianos would be actionable under this bill.
 
 141 Cong. Rec. S19306, S19310 (daily ed. Dec. 29, 1995)
 (statement of Sen. Hatch). Thus the archetypal problems
 involved non-competing products as to which there could, by
 definition, be no confusion and a world-famous brand name which
 was either tarnished or blurred by its application to a
 different product which was obviously trading on the good will
 of that name.
 The language of the FTDA itself is, however, not
 limited to addressing these archetypal problems. A few
 observations are in order. First, the Act applies to products
 which are competitors (as is true of the faucets here) as well
 as to products which are totally dissimilar and are not
 competitors. Second, the Act applies to a famous "mark" and
 does not restrict the definition of that term to names or
 traditional marks. In the absence of such a restriction, the
 Act applies to all types of marks recognized by the Lanham Act,
 including marks derived from product designs. Kohler's
 argument that the Act cannot, as a matter of statutory
 interpretation, be applied to product design is rejected. 
 Third, the Act applies even where there is no customer
 confusion, a point with consequences discussed later. Fourth,
 the additional protection afforded by the Act requires that a
 mark go beyond what is required for ordinary Lanham Act
 protection. Only those marks which are "distinctive and famous"
 are protected. 15 U.S.C. 1125(c)(1). As set forth in the
 1987 Trademark Review Commission Report, the precursor of the
 1996 Act, this language reflected "the policy goal that to be
 protected, a mark had to be truly prominent and renowned." 3
 McCarthy 24.91 (citing The United States Trademark
 Association Trademark Review Commission Report and
 Recommendations to USTA President and Board of Directors, 77
 Trademark Rep. 375, 459-60 (1987)). With this background, we
 turn to the district court's two essential conclusions.
 A. Fame and Distinctiveness
 The requirements of commercial use, non-
 functionality, and distinctiveness are common to both the
 infringement claim and the FTDA dilution claim. In order to
 fall within the sphere of protection against dilution the FTDA
 adds an additional requirement: the FTDA grants protection only
 to famous marks. See 15 U.S.C. 1125(c); cf. Gilson
 5.12[1][a] (calling the FTDA "a major breakthrough for an
 elite category of trademark owners"). The FTDA provides a non-
 exclusive list of eight factors that courts should consider in
 determining whether a mark is "distinctive and famous." 15
 U.S.C. 1125(c)(1). The eight statutory factors are: 
 (A) the degree of inherent or acquired
 distinctiveness of the mark;
 (B) the duration and extent of use of the mark in
 connection with the goods or services with which the
 mark is used;
 (C) the duration and extent of advertising and
 publicity of the mark;
 (D) the geographical extent of the trading area in
 which the mark is used;
 (E) the channels of trade for the goods or services
 with which the mark is used;
 (F) the degree of recognition of the mark in the
 trading areas and channels of trade used by the
 marks' owner and the person against whom the
 injunction is sought;
 (G) the nature and extent of use of the same or
 similar marks by third parties; and
 (H) whether the mark was registered under the Act of
 March 3, 1881, or the Act of February 20, 1905, or on
 the principal register. 
 Id. The district court found likelihood of success on the
 claim that the VOLA's design was a famous mark. Kohler
 challenges this finding.
 Both the text and legislative history of the original
 bill in 1988 and the FTDA itself indicate a congressional
 intent that courts should be discriminating and selective in
 categorizing a mark as famous. For example, the Senate
 Judiciary Committee Report on the 1988 precursor bill said the
 Committee wished "to underscore its determination that the new
 dilution provisions should apply only to . . . very unique
 marks." 3 McCarthy 24:92 n.6 (quoting S. Rep. No. 100-515,
 at 41-42) (internal quotation marks omitted). The Trademark
 Review Commission noted that the showing of fame required
 employment of a "higher standard" than fame among an
 "appreciable number of persons" in order to be "eligible for
 this extraordinary remedy." Id. n.8 (quoting The United States
 Trademark Association Trademark Review Commission Report, 77
 Trademark Rep. at 461) (internal quotation marks omitted). One
 commentator has referred to this category of famous marks as
 "Supermark[s]." See Gilson 5.12[1][a]. As the Restatement
 (Third) of Unfair Competition notes:
 A mark that evokes an association with a specific
 source only when used in connection with the
 particular goods or services that it identifies is
 ordinarily not sufficiently distinctive to be
 protected against dilution.
 
 Restatement (Third) of Unfair Competition 25 cmt. e (1995).
 The record here reflects that there was not
 sufficient attention paid to the heightened fame standard that
 the FTDA establishes. The district court found that "in its
 market, the VOLA's design is famous and distinctive" based on
 its prior analysis under the infringement claim that "the VOLA
 mark is strong, and has acquired secondary meaning in its
 market; and it has been used for some twenty years in this
 country." Lund I, 11 F. Supp. 2d at 125. Both the Restatement
 (Third) of Unfair Competition and the state anti-dilution
 statutes against the background of which Congress enacted the
 FTDA make clear that the standard for fame and distinctiveness
 required to obtain anti-dilution protection is more rigorous
 than that required to seek infringement protection. SeeRestatement (Third) of Unfair Competition 25 cmt. e. As one
 commentator has stated:
 Certainly, the mere acquisition of secondary meaning
 to achieve trademark status in a non-inherently
 distinctive designation is nowhere near sufficient to
 achieve the status of "famous mark" under the anti-
 dilution statute. The acquisition of secondary
 meaning merely establishes the minimum threshold
 necessary for trademark status: section 43(c)
 requires a great deal more. 
 
 3 McCarthy 24:91; see also Gilson 5.12[1][c][ii] ("A
 trademark can certainly be distinctive without being famous,
 but it cannot be famous without being distinctive."). 
 We do not understand the district court's conclusion
 about fame, despite some ambiguity, to have rested solely on
 its conclusion that the VOLA faucet was distinctive (because it
 had acquired secondary meaning); any such per se analysis would
 be erroneous. But it appears that the district court did not
 apply the more rigorous definition of fame under the FTDA. 
 While one can posit a case having very strong facts which
 support a distinctiveness finding based on secondary meaning
 and then using those facts to support the separate, more
 rigorous analysis of fame, the facts in this case do not have
 such strength. Lund has a difficult case to establish fame
 through the product design of the VOLA faucet, and this record
 is not strong. There has been no use by Kohler of the VOLA
 name, or any other name by which the faucet is known. Kohler's
 use, if any, is of a like product design. There is little to
 suggest that this product design, itself unregistered and not
 inherently distinctive, is so strong a mark and so well
 publicized and known that it has achieved the level of fame
 Congress intended under the Act. Consumer surveys could be
 used as evidence of such fame, but consumer surveys are absent
 from this case. Additionally, although some marks, such as
 COCA-COLA, may be so famous as to be judicially noticed, seeGilson 5.12[1][c][iii], the VOLA faucet is far from being a
 candidate for such judicial notice.
 Further, national renown is an important factor in
 determining whether a mark qualifies as famous under the FTDA. 
 Although the district court found that "in the world of interior
 design and high-end bathroom fixtures, the VOLA is renowned,"
 Lund I, 11 F. Supp. 2d at 126, and that the faucet has been
 featured and advertised in national magazines and displayed in
 museums, whether the VOLA's identifying design is sufficiently
 famous to qualify for the FTDA's protection is far from clear. 
 In light of the rigorous standard for fame, we find that Lund
 has not met its burden of showing likelihood of success.
 B. Dilution 
 Under the FTDA, even if a mark is famous there is no
 relief unless that mark has been diluted. As the district
 court noted, there are two types of dilution recognized:
 blurring and tarnishing. This case involves no claim of
 tarnishing, an area in which Congress expressed a strong
 interest. Further, in light of the finding of no customer
 confusion, only a particular type of blurring may be involved.
 The intellectual origins of the dilution doctrine are
 traced to a 1927 Harvard Law Review article, which urged
 protection against "the gradual whittling away or dispersion of
 the identity and hold upon the public mind of the mark or name
 by its use upon non-competing goods." Schecter, The Rational
 Basis of Trademark Protection, 40 Harv. L. Rev. 813, 825
 (1927). Although the origins of the doctrine are concerned
 with non-competing goods, Congress used language in the FTDA
 which extends dilution protection even to competing goods. 
 "Dilution" is defined as "the lessening of the capacity of a
 famous mark to identify and distinguish good or services." 15
 U.S.C. 1127; see also H.R. Rep. No. 104-374, at 3, reprinted
 in 1995 U.S.C.C.A.N at 1030 (stating that dilution "applies when
 the unauthorized use of a famous mark reduces the public's
 perception that the mark signifies something unique, singular,
 or particular"); 3 McCarthy 24:93 ("The crux is whether this
 particular challenged use lessens the capacity of the famous
 mark to carry out its role as a trademark -- namely, to
 identify and distinguish."). 
 This case differs in several respects from usual
 dilution cases. First, unlike most claims of dilution by
 tarnishment or blurring, the aspect of its product that Lund
 seeks to protect -- the design of the VOLA faucet -- likely
 could have been protected by a design patent. The possibility
 of obtaining a design patent is not dispositive of the
 availability of trade dress protection: more than one form of
 intellectual property protection may simultaneously protect
 particular product features. Moreover, design patent
 protection would not have provided protection identical to that
 sought here. Nevertheless, the availability of design patent
 protection does suggest that the claim in this case differs
 fundamentally from the claims the drafters of the FTDA had in
 mind -- cases where dilution protection is the only form of
 protection available for a famous mark threatened by
 unauthorized use of the mark that lessens the mark's capacity
 to identify its source. Congress's intent to provide
 protection where none previously existed is evidenced by the
 House Report's statement that "[a] federal dilution statute is
 necessary because famous marks ordinarily are used on a
 nationwide basis and dilution protection is currently only
 available on a patch-quilt system of protection, in that only
 approximately 25 states have laws that prohibit trademark
 dilution." H.R. Rep. No. 104-374, at 3, reprinted in 1995
 U.S.C.C.A.N. at 1030.
 Second, Lund is seeking protection against a direct
 competitor. Although the FTDA states that dilution protection
 is available against unauthorized use of a famous mark that
 lessens the mark's ability "to identify and distinguish goods
 or services, regardless of the presence or absence of . . .
 competition between the owner of the famous mark and other
 parties," 15 U.S.C. 1127 (emphasis added), dilution protection
 has most often been extended to non-competing uses of a mark,
 see, e.g., H.R. Rep. No. 104-374, at 3, reprinted in 1995
 U.S.C.C.A.N. at 1030 (giving examples of "DUPONT shoes, BUICK
 aspirin, and KODAK pianos"); 3 McCarthy 24.72 (noting "split
 of authority under . . . state statutes as to whether the anti-
 dilution rule is applicable where the parties are in
 competition"). The FTDA recognizes the possibility that
 dilution may occur in some circumstances where, although some
 consumers are not confused as to the products' sources, a
 competitor's use of a mark tarnishes or blurs a senior mark. 
 Nevertheless, such cases are likely to be exceptions to the
 more common cases of dilution by non-competing marks. Dilution
 laws are intended to address specific harms; they are not
 intended to serve as mere fallback protection for trademark
 owners unable to prove trademark infringement.
 While there may be a tendency to think of dilution in
 terms of confusion, Congress made it clear that dilution can
 occur even in the absence of confusion. It is simple to see
 why that should be so when non-competing goods are at issue. 
 No one would confuse Kodak pianos with Kodak film, but the use
 of the name on the piano could dilute its effectiveness as a
 mark for the film. But Congress did not say that there can be
 dilution without confusion only among non-competing goods. As
 the district court aptly noted, the analysis becomes
 complicated when the concept of blurring is applied to
 competing similar products. 
 We deal first with the approach taken by the district
 court, an approach which had support in precedent. The
 district court articulated the standard for determining
 blurring as follows: "Lund must demonstrate that 'the use of a
 junior mark has caused a lessening of demand for the product or
 services bearing the famous mark.'" Lund I, 11 F. Supp. 2d at
 126 (quoting Ringling Bros.-Barnum & Bailey Combined Shows,
 Inc. v. Utah Div. of Travel Dev., 955 F. Supp. 605, 616 (E.D.
 Va. 1997)). This, we think, is not the correct standard. As
 Kohler observes, demand for one product is almost always
 lessened whenever a competing product achieves a measurable
 degree of success. Further, blurring has to do with the
 identification of a product and that is not the same thing as
 a lessening of demand.
 In addressing the dilution claim, the district court
 used the "Sweet factors," named after the six factors set forth
 in Judge Sweet's concurrence in Mead Data Central, Inc. v.
 Toyota Motor Sales, U.S.A., Inc., 875 F.2d 1026, 1035 (2d Cir.
 1989) (Sweet, J., concurring), which involved a claim brought
 under a New York dilution statute. Some district courts have
 used these factors to examine whether dilution exists under the
 FTDA. See, e.g., Ringling Bros.-Barnum & Bailey Combined
 Shows, Inc. v. B.E. Windows Corp., 937 F. Supp. 204, 211-14
 (S.D.N.Y. 1996); WAWA, Inc. v. Haaf, 40 U.S.P.Q.2d (BNA) 1629,
 1632-33 (E.D. Pa. Aug. 7, 1996), aff'd, 116 F.3d 471 (3d Cir.
 1997); Clinique Lab., Inc. v. Dep Corp., 945 F. Supp. 547, 562
 (S.D.N.Y. 1996). 
 Kohler argues that Judge Sweet's six-factor test is
 inappropriate in determining whether dilution has occurred for
 purposes of the FTDA. We agree. The Sweet factors have been
 criticized by both courts and commentators for introducing
 factors that "are the offspring of classical likelihood of
 confusion analysis and are not particularly relevant or helpful
 in resolving the issues of dilution by blurring." 3 McCarthy
 24:94.1. The six Sweet factors are: "1) similarity of the
 marks 2) similarity of the products covered by the marks 3)
 sophistication of consumers 4) predatory intent 5) renown of
 the senior mark [and] 6) renown of the junior mark." Mead
 Data, 875 F.2d at 1035 (Sweet, J., concurring). McCarthy urges
 that only the first and fifth of Judge Sweet's factors -- the
 similarity of the marks and the renown of the senior mark --
 are relevant to determining whether dilution has occurred. See3 McCarthy 24:94.1; see also Hershey Foods Corp. v. Mars,
 Inc., 998 F. Supp. 500, 520 (M.D. Pa. 1998) (stating that
 "whether the products are similar or not adds nothing to the
 analysis" because "dilution can apply to competitors"); Klieger,
 Trademark Dilution: The Whittling Away of the Rational Basis
 for Trademark Protection, 58 U. Pitt. L. Rev. 789, 826-27
 (1997) (noting that "few of these factors bear any relation to
 whether a particular junior use will debilitate the selling
 power of a mark" and that "[s]o long as a mark qualifies for
 dilution protection and the senior and junior uses of the mark
 are not so unrelated as to foreclose the possibility of a
 mental connection, blurring . . . is a foregone conclusion"). 
 These criticisms are well taken.
 The district court's finding of likelihood of
 dilution by blurring depended on its use of inappropriate Sweet
 factors. As McCarthy points out, use of factors such as
 predatory intent, similarity of products, sophistication of
 customers, and renown of the junior mark work directly contrary
 to the intent of a law whose primary purpose was to apply in
 cases of widely differing goods, i.e. Kodak pianos and Kodak
 film. See 3 McCarthy 24:94.1.
 There are difficulties with the Sweet factors even
 when used with competing goods. Blurring occurs in the minds
 of potential customers. Predatory intent tells little about
 how customers in fact perceive products. That customers are
 sophisticated may well mean less likelihood of blurring. That
 customers knowingly choose to pay less to get a similar
 product, and trade lower price against having a product of
 greater fame, does not, contrary to Lund's argument, establish
 blurring. Indeed, the district court's findings, in the
 infringement context, of dissimilarity and sophistication of
 the customers tend to cut against any finding of blurring. "The
 familiar test of similarity used in the traditional likelihood
 of confusion test cannot be the guide [for dilution analysis],
 for likelihood of confusion is not the test of dilution." Id. 24:90.1. Instead, the inquiry is into whether target
 customers are likely to view the products "as essentially the
 same." Id.
 There is a more fundamental problem here in
 attempting to apply the dilution analysis to the design itself
 of the competing product involved. We doubt that Congress
 intended the reach of the dilution concept under the FTDA to
 extend this far and our doubts are heightened by the presence
 of constitutional constraints. Where words are the marks at
 issue it is easy to understand that there can be blurring and
 tarnishment when there is a completely different product to
 which the words are applied. The congressional history
 described earlier gives such examples. What is much more
 difficult is to see how dilution is to be shown where some of
 a design is partially replicated and the result is largely
 dissimilar and does not create consumer confusion. If that is
 so, as is true here, then it is difficult to see that there has
 been dilution of the source signaling function of the design
 (even assuming that such a function has been established
 through secondary meaning).
 Instead, it appears that an entirely different issue
 is at stake -- not interference with the source signaling
 function but rather protection from an appropriation of or free
 riding on the investment Lund has made in its design. That
 investment is usually given protection by patents, which have
 a limited duration. See W.T. Rogers Co., 778 F.2d at 348. But
 again, that free riding or appropriation appears to be of the
 beauty of the object and not of the source, and may in fact be
 good for consumers. As the district court observed, these
 sophisticated buyers know a different source is involved and
 are, accordingly, most likely purchasing because of the
 aesthetics. And even if there is some appropriation or free
 riding, the extent of it here is not clear. Certainly it is
 not plausible to think that Congress intended to protect
 aesthetic characteristics by simply assuming harm or damages
 based on the fact that the plaintiff will sell less if the
 defendant sells more. What is clear is that the interests here
 are not the interests at the core of what Congress intended to
 protect in the FTDA.
 It is possible that Congress did not really envision
 protection for product design from dilution by a competing
 product under the FTDA, but the language it used does not
 permit us to exclude such protection categorically and rare
 cases can be imagined. But a broad reading of dilution would
 bring us close to the constitutional edge, and we decline to
 attribute such brinksmanship to Congress, and so insist on
 rigorous review. 
 Under the interpretation of the fame and dilution
 requirements for the FTDA set forth today, the requirements for
 granting the preliminary injunction have not been met.
 VII. Constitutionality of the FTDA
 Kohler argues that the FTDA may never
 constitutionally be applied to enjoin a competitor in a product
 design trade dress case. Kohler's constitutional challenge
 involves two steps. First, Kohler argues that applying the
 FTDA to product designs grants patent-like protections for an
 unlimited period of time. Second, Kohler argues that
 Congress's Commerce Clause power -- the basis of Congress's
 regulation of trademarks and trade dress -- cannot be used to
 trump the Patent Clause. Lund responds that federal anti-
 dilution legislation is fully consistent with Congress's
 Commerce Clause power, and that patent and trademark laws
 protect different interests and serve different goals.
 The district court correctly noted that Kohler faced
 a "very high preliminary injunction standard on their
 [constitutional] claim," and that the statute was
 "presumptively constitutional." Lund II, 11 F. Supp. 2d at
 134. The court concluded that defendant Kohler was unlikely to
 succeed with its argument that the FTDA is unconstitutional in
 all product design contexts.
 Kohler's constitutional attack on application of the
 FTDA here is mooted by our resolution of the injunction issue. 
 To the extent Kohler is mounting something akin to a facial
 attack, we think it better not to address constitutional issues
 in the abstract. The resolution of any conflict between the
 Patent Clause and the FTDA is better handled on specific facts
 which present the issues with clarity, and not on the basis of
 theoretical impacts. 
 VIII. Conclusion
 Both the parties and the district court labored
 through this case without the benefit of binding precedent on
 a number of key and difficult issues, particularly the
 interpretation of the FTDA. The denial of the preliminary
 injunction on the infringement claim is affirmed. The grant of
 the injunction on the FTDA claim is vacated inasmuch as there
 were no findings on functionality and standards for determining
 both fame and dilution under the FTDA were used which are
 different from those announced today and the evidence does not
 show probability of success under those standards. The case is
 remanded for further proceedings not inconsistent with this
 opinion. No costs are awarded.
 
 - Concurring opinion follows -
 BOUDIN, Circuit Judge, concurring. Ordinarily the
 creator of something new--a useful device, a pharmaceutical
 drug, an ornament, a painting--owns any such object that he or
 she makes but can prevent its replication by others only
 pursuant to the patent and copyright laws. A central
 limitation on patent and copyright protection, stemming from
 the Constitution itself, is that it is limited in time. SeeU.S. Const. art. I, 8, cl. 8; 35 U.S.C. 101, 154 (20-year
 utility patent); 35 U.S.C. 171, 173 (14-year design patent);
 17 U.S.C. 302-304 (various limited-time copyrights). After
 the period of protection expires, copying by others is allowed. 
 This case presents, in addition to other problems, the threat
 that the permanent injunction sought may prevent the Lund
 faucet from being duplicated forever.
 In substance, Lund created a faucet configuration
 called VOLA that involves a downward curving water pipe
 protruding from a wall (rather than the sink itself) and a
 similarly protruding control rod to regulate both water flow
 and temperature (instead of the usual pair of spigots). The
 concept of a wall-based mechanism, and the size and shape and
 relative proportions of the pipe and control rod, are pleasing
 to customers. The resulting VOLA faucet configuration is
 successful and recognized in the trade.
 Lund has now obtained a preliminary injunction against
 Kohler forbidding Kohler from selling Kohler's own faucet
 system that embodies the same concept and a similar but not
 identically shaped pipe and control rod. What Lund regards as
 the scope of its "monopoly" is not entirely clear: all we know
 is that this Kohler faucet system has been enjoined. What will
 be assumed, or else the legal problems would be even greater
 than they are, is that the concept of a water pipe and control
 rod protruding from a wall is not sought to be prohibited but
 only one whose shape and size are similar to VOLA. Even so,
 a serious problem exists because the assumed protection (if the
 preliminary injunction matures into a permanent one) could be
 perpetual.
 Lund says that this perpetual protection of its design
 is permitted because its source is not a design patent --Lund
 has not sought one--but rather the trademark laws. Trademarks
 are ordinarily conceived as names (e.g., Kodak) or marks (the
 AT&T striped circle logo), but trademarks also include so-
 called "trade dress," see 15 U.S.C. 1127; and this in turn
 includes the ornamental design of an article where the design
 performs the traditional "source signaling" function of
 trademarks. Usually, this is achieved by the "wrapping" (e.g.,
 the classic Coca Cola bottle) or some ornament affixed to the
 product (the star symbol on the Mercedes hood); but the design
 of the product itself can sometimes qualify. 
 A permanent restriction on copying the design of a
 product might still seem offensive to patent and copyright
 policy, but at least this protection can be explained where the
 replication would otherwise confuse buyers as to source,
 traditionally the concern of trademark protection. The
 difficulty in this case arises because Congress has removed the
 requirement of confusion for protection of "famous" trademarks
 and said that, in the alternative, they will be protected
 against "dilution" even where no confusion exists as to source. 
 15 U.S.C. 1125(c). Congress was worried that even without
 customer confusion as to source a famous trade name or mark,
 like "Kodak," could be blurred or degraded by being attached by
 others to their own products (e.g., sports clothing, dog food). 
 See 141 Cong. Rec. S19306, S19310 (daily ed. Dec. 29, 1995)
 (statement of Sen. Hatch).
 By contrast to a trademark consisting of a name or
 insignia, a product design will not often qualify as a
 trademark inviting protection from dilution. A trade name or
 device usually identifies source, but the design of the product
 itself in most cases makes the product more efficient,
 attractive, or both. If more efficient, trademark protection
 is foreclosed altogether under the "functionality" doctrine,
 see Qualitex, 514 U.S. at 164; Two Pesos, 505 U.S. at 775; and
 if attractiveness is the primary function, the product design
 does not normally qualify as a candidate to achieve secondary
 meaning and thus trademark status. See Inwood Labs., Inc. v.
 Ives Labs., Inc., 456 U.S. 844, 851 n.11 (1982).
 But conceivably in some rare case a product design
 might have source signaling as its main function (perhaps the
 old 1950's Cadillac tail fin might be an instance) and be
 copied by a competitor (say, for Volkswagen Beetles) without
 any risk of customer confusion. At that point, if the new
 trademark statute is taken literally, Cadillac might then claim
 a permanent monopoly on its tail fin design, subject only to a
 showing that Volkswagen's use threatened to "dilute" the
 strength of that tail fin as a Cadillac trademark. See 15
 U.S.C. 1125(c). One may wonder whether Congress ever
 contemplated such a result, but the statute's language arguably
 permits it or at least does not explicitly foreclose the
 possibility.
 If so, much turns on how dilution is defined and
 proved. The federal statute is recent, but state laws have
 protected against dilution for some time, and under those
 statutes there is some tendency to assume that dilution is
 threatened wherever the famous trademark is copied. After all,
 the concern is with the long-term "whittling away" of the
 strength of the mark by other unauthorized uses, see L.L. Bean,
 Inc. v. Drake Publishers, Inc., 811 F.2d 26, 30 (1st Cir.
 1987), and, absent confusion, there may be no immediate damage
 from any single use. Where only a word or symbol is forever
 preempted, this protective approach toward the trademark may
 make sense, and in all events does not pose much risk to the
 policies of the patent and copyright clauses.
 The situation is quite different where design of an
 article is given permanent protection without any threat of
 confusion. If buyers prefer articles of that design, then the
 public pays a price whenever the design cannot eventually be
 used by other manufacturers. In the case of patents and
 copyrights, the foreclosure of competition is deemed a price
 worth paying for a limited time--in order to induce such
 creations--but only for a limited time. Is this policy of
 time-limited protection, constitutional at its core, overcome
 wherever dilution is threatened--even though no confusion can
 be proved and any impairment of the trademark may be only
 potential and directed primarily to protecting the seller
 rather than the public?
 One might point to the possible diversion of sales from
 Lund to Kohler as practical harm in this very case. Yet such
 diversion does not prove either confusion or dilution: a copied
 product can easily take sales from the original manufacturer if
 the copied product is better made or sold at a lower price or
 the design is slightly better--outcomes generally beneficial to
 the public. Giving weight to diversion of sales, in the
 absence of confusion of customers, simply underscores that the
 protection is generally similar to that afforded for patented
 articles--save that the protection here may be unlimited in
 time. Giving patent-like protection a new name does not avoid
 constitutional limitations. Cf. Bonito Boats, Inc. v. Thunder
 Craft Boats, Inc., 489 U.S. 141, 146 (1989).
 The traditional interest in trademark protection is
 stretched very thin in dilution cases where confusion is absent
 and a professed aim is to protect the maker's investment in the
 trademark. See H.R. Rep. No. 104-374, at 3 (1995), reprinted
 in 1995 U.S.C.C.A.N. at 1030. And the threat to the public
 interest, ordinarily countered by the time limit on patent
 protection, is acute where a permanent protection is offered
 not to a word or symbol but to the design of an article of
 manufacture. In such an instance, it is a difficult
 constitutional question whether protecting the investment can
 outweigh the public interest in replication, a question best
 deferred unless and until all other preconditions for
 protection are resolved in favor and decision on this last
 issue is absolutely necessary. See El Dia, Inc. v. Hernandez
 Colon, 963 F.2d 488, 494 (1st Cir. 1992).